UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
                                                :
JAMES TRIMBLE,                                  :
                                                :       CASE NO. 5:10-CV-00149
                      Petitioner,               :
                                                :
vs.                                             :       OPINION & ORDER
                                                :       [Resolving Doc. 19]
DAVID BOBBY, Warden                             :
                                                :
                      Respondent.               :
                                                :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        Petitioner James Earl Trimble petitions for a writ of habeas corpus under 28 U.S.C. § 2254.[1]

A jury convicted Trimble of shooting and killing his then-girlfriend and her son with an AR-15

assault rifle.  Before police apprehended him, Trimble also abducted and killed a college student

using a Sig Sauer 9-mm pistol.  For these murders, Trimble received three death sentences.  He now

claims that six grounds support habeas relief from these convictions.  Because the Court finds that

an alternate juror who was later empaneled during the penalty phase of Trimble's trial could not put

aside his personal views on the death penalty and apply the law, and because the Court finds that the

Ohio Supreme Court's determination to the contrary was an unreasonable determination of fact,

Trimble is entitled to a conditional writ of habeas corpus on this ground only.  Accordingly, the

Court **CONDITIONALLY GRANTS IN PART** and **DENIES IN PART** Trimble's petition for

relief.

_____

        [1][Doc. 19.]

Case No. 5:10-CV-00149
Gwin, J.

# I. Background

## A. The Killings

A jury convicted Petitioner James Earl Trimble of three counts of aggravated murder.[2/]  The jury recommended three death sentences, and the judge imposed three death sentences.[3/]

On January 21, 2005, James Earl Trimble used an AR-15 rifle to kill his live-in girlfriend, Renee Bauer, and her seven-year-old son, Dakota Bauer.[4/]  Trimble was a gun-nut but also a convicted felon.[5/]  He possessed over twenty firearms and apparently purchased the AR-15 assault weapon at a gun show to avoid a background check.[6/]  Trimble also owned numerous high-capacity magazines capable of carrying thirty rounds of ammunition.[7/]

Moments after the killings, Trimble's mother, Elizabeth Bresley called him at the home Trimble had shared with Renee Bauer, and he confessed to the killings.[8/]  Bresley then called James

---

[2/] *State v. Trimble*, 911 N.E. 2d 242, 251, 306 (Ohio 2009).  The jury also convicted Trimble of aggravated burglary, kidnapping, felonious assault, and firearm specifications.  [App'x 5 at 7084-89.]  The Court relies primarily on the facts as found by the Ohio Supreme Court because

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  The Court's references to appendices refer to the appendices filed manually on CD-ROM as Doc. 47.

[3/] [App'x 5 at 8044-45, 8084-8095.]

[4/] *Trimble*, 911 N.E.2d at 251.

[5/] [App'x 3 at 585-598.]

[6/] *Id.* at 254.

[7/] [App'x 2 at 184.]

[8/] *Id.* at 251.

Case No. 5:10-CV-00149
Gwin, J.

Trimble's brother, Arthur Trimble, and asked him to contact James Trimble.[9] Arthur Trimble called

James Trimble, and James Trimble again confessed to killing Renee and Dakota Bauer.[10] Arthur

Trimble told James Trimble to stay where he was, and Arthur Trimble called the police.[11]

Instead of waiting for the police, James Trimble left his house on foot.[12] After holding two

people at gunpoint, Trimble made his way to the duplex home of Sarah Positano, a 22-year-old

college student.[13] Apparently, Trimble had never met Positano before.[14] He took her hostage.[15]

Police assembled a SWAT Team.[16]

At 11:18 p.m., Positano phoned 9-1-1 and reported that a man had entered her home and that

the man who had broken into her home would shoot her if police attempted to enter the home.[17] She

told the operator that Trimble had a "9-mm pistol with no safety."[18] Trimble got onto the phone call

and said, "I have got the hammer held back [and] the trigger pulled. So if the cops shoot me or even

attempt to break in here, I will let go of the trigger and the innocent girl will die."[19] During the call,

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at 252.

[14] [App'x 4.]

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

Case No. 5:10-CV-00149
Gwin, J.

Positano was heard asking Trimble "[c]ould you not put the gun to my head?"[20]

In follow-up calls with a hostage negotiator, Trimble repeated that he was holding the gun with no safety and with the trigger pulled.[21] He also told the negotiator that he did not want to "hurt any innocents" and that "if [the police] just give me a couple hours to get my shit together, I'll let [Positano] go."[22] During a call between Positano and a second hostage negotiator, Trimble could be overheard saying "Sarah, in two hours you're going to go home *** if the cops don't come up here."[23] Seconds later, however, Positano began screaming "I've been shot," and gasped for breath.[24] Shortly thereafter, and around 12:05a.m. on January 22, 2005, authorities lost the phone connection.[25]

Seven hours later, at 7:30a.m., the SWAT team entered the residence and found Positano dead.[26] They arrested Trimble.[27]

**B.  State's Investigation and Evidence**

In custody, Trimble waived his *Miranda* rights.[28] In a taped interview with Portage County

---

[20] *Id*.

[21] *Id*. at 253.

[22] *Id*.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] *Id*.

-4-

Case No. 5:10-CV-00149
Gwin, J.

Sheriff Duane Kaley, Trimble admitted that he committed the three murders.[29]  He said that he did not remember killing Renee and Dakota Bauer, but, he said, "I must have.  No one else was there."[30] He also said that he did not intend to kill Positano. but instead, "had the hammer cocked and the police came in the house and [he] turned to look at them and [the gun] went off."[31]  Trimble told Sheriff Kaley that the authorities tried to enter Positano's residence multiple times.  Sheriff Kaley said that authorities only entered Positano's residence once, when they arrested Trimble.[32]

All three victims died of gunshot wounds.[33]  Renee Bauer had been shot once in the front of the head and eleven times in the back and the hand.[34]  Her body also had bruises from blunt-force injuries inflicted hours or days before her death.[35]  Dakota Bauer was shot six times in his head, neck, and torso.[36]  Two of his wounds showed evidence of "re-entry," meaning that the bullet passed through something before striking him.[37]  Sarah Positano died from a single gunshot wound to her neck that severed her carotid artery and punctured her left lung.[38]

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 254.

[32] *Id.*

[33] *Id.* at 255.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

Case No. 5:10-CV-00149
Gwin, J.

Police searched Trimble's and Positano's homes.[39]  In the basement of Trimble's home,

agents found an open gun case, military belts, magazine pouches, a handgun, and three long guns.[40]

They also found a locked gun safe that they opened after obtaining a warrant.[41]  Inside the gun safe,

they found more guns, including handguns, semiautomatic rifles, an assault rifle, and carbines, as

well as ammunition.[42]  The state's experts agreed that the weapons found in the basement were not

used in any of the killings.[43]  Nonetheless, the prosecutors eventually admitted the weapons found

in Trimble's basement at the trial—a ruling that Trimble challenges in this petition.

In Positano's home, police found the AR-15 assault rifle and a Sig Sauer 9-mm handgun, the

apparent murder weapons.[44]  The state's investigators testified that the nineteen .223-caliber casings

collected at Trimble's home and the eighteen recovered at Positano's residence had been fired from

the AR-15 discovered in Positano's residence.[45]  They said that the eight additional .223 caliber-

casings recovered at Positano's residence lacked sufficient indicia to tie them to the AR-15 found

in the residence.[46]  The state's investigators also determined that the nineteen 9-mm casings

recovered from Positano's residence had been fired from the Sig Sauer 9-mm handgun found there.[47]

---

[39]*Id.* at 254.

[40]*Id.*

[41]*Id.*

[42]*Id.*

[43]*Id.* at 255.

[44]*Id.*

[45]*Id.* at 254-55.

[46]*Id.* at 255.

[47]*Id.* at 254-55.

Case No. 5:10-CV-00149
Gwin, J.

**C. Trial**

A grand jury indicted Trimble on three counts of aggravated murder, all with death specifications, as well as three counts of kidnapping, two counts of felonious assault, and one count of aggravated burglary with firearm specifications.[48/]  Trimble pled not guilty.[49/]

Following extensive voir dire, the trial court empaneled a jury of twelve together with four alternates.[50/]  Trimble used five of the six available peremptory challenges to challenge the jury panel.  The trial judge gave Trimble two peremptory challenges for the alternates and he used both of them.[51/]  The court denied Trimble's challenges for cause to several jurors, including Juror 139, who was eventually seated during the penalty phase.[52/]  In this petition, Trimble says that the trial court violated his constitutional rights when it did not excuse Juror 139 for cause.

At trial, the state presented extensive evidence of Trimble's guilt.[53/]  Prosecutors offered into evidence—over Trimble's attorney's objections—all of the firearms found in Trimble's basement.[54/]

In his defense, Trimble presented nine witnesses.  Trimble did not testify (beyond his previously recorded confession to Sheriff Kaley, which the state introduced).[55/]  Trimble's counsel

---

[48/]*Id.* at 257.  The grand jury also charged Trimble with twelve counts of attempted murder of a police officer and one count of having weapons under a disability.  These charges were dismissed, as were firearm specifications initially included under the aggravated murder charges.  *Id.*

[49/]*Id.*

[50/] [App'x 5 at 3917.]

[51/]*Id.* at 258; [App'x 5 at 3918-20.]

[52/][App'x 5 at 2765-66, 7630]

[53/]*Id.* at 264.

[54/]*Id.* at 262.

[55/]*Id.* at 255.

Case No. 5:10-CV-00149
Gwin, J.

focused on why the killings occurred and suggested decreased culpability.[56]  The jury found Trimble

guilty on all charges.[57]  In addition to his challenge that Juror 139 should have been excused,

Trimble now says that the admission of the firearms violated his constitutional rights to a fair trial.

  With the finding of guilt, the case proceeded to the penalty phase.  During the penalty phase,

Trimble called eleven witnesses, including his mother, his minister, clinical psychologists, and

business associates.  Trimble also made an unsworn statement.[58]  In mitigation, Trimble introduced

evidence that he struggled with alcohol addiction and addiction to other substances, especially

methamphetamine.[59]  Trimble argued that the methamphetamine addiction contributed to a

psychological condition similar to schizophrenia.  In response, the state sought to introduce evidence

that Trimble had been dishonorably discharged from the Air Force and had been violent towards his

former wife.[60]  In this petition, Trimble says that these attempts to impugn his character were

unconstitutionally impermissible and that his counsel rendered ineffective assistance during this

punishment phase of the trial.

  Ultimately, the jury recommended death sentences, and the trial court imposed death

sentences for each of the killings.[61]

## D.  Subsequent Proceedings

---

[56]/*Id.* at 255-57.

[57]/[App'x 5 at 7084-7089.]

[58]/[App'x 5 at 7189-7960.]

[59]/[App'x 5 at 7475.]

[60]/[App'x 5 at 7245-48, 7579-84.]

[61]/[App'x 5 at 8045; 8094-96.]

Case No. 5:10-CV-00149
Gwin, J.

Trimble timely appealed, and separately sought post-conviction relief.[62]   The trial court denied post conviction relief.[63]   Trimble then appealed that decision, saying that the trial court erred in denying him post-conviction relief, and that it erred when it denied Trimble funds for a positron emission tomography scan, a kind of brain imaging scan.[64]   The Ohio Court of Appeals affirmed the trial court's decision to deny relief, and the Ohio Supreme Court declined jurisdiction.[65]   On direct appeal, Trimble asserted fifteen grounds for relief.[66]   The Ohio Supreme Court denied relief on all grounds and affirmed Trimble's death sentence.[67]   The United States Supreme Court denied certiorari.[68]

Trimble then filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254.[69] He claims six grounds for relief.  First, Trimble says that the service of Juror 139 violated his right to a fair and impartial jury guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution.[70]   Second, Trimble says that the admission and display of firearms not used in the killings violated his Fourteenth Amendment due process rights.[71]   Third, Trimble says that

---

[62]/*Id.* at 251; [App'x 1 at 2495.]

[63]/[App'x 1 at 3466.]

[64]/[Doc. 19 at 20.]

[65]/[App'x 1 at 3466;] *State v. Trimble*, No. 2007-P-0098, 2008 WL 5147441 (Ohio Ct. App. Dec. 8, 2008). [App'x 1 at 3898.]

[66]/[App'x 1 at 2002.]

[67]/ *See Trimble*, 911 N.E.2d 242.

[68]/*Trimble v. Ohio*, 130 S. Ct. 752 (2009).

[69]/[Doc. 19.]

[70]/[Doc. 19 at 32.]

[71]/[Doc. 19 at 42.]

-9-

Case No. 5:10-CV-00149
Gwin, J.

prosecutorial misconduct denied him a fair and reliable sentencing hearing in violation of his

Fourteenth Amendment rights.[72/]  Fourth, Trimble says that he was denied the effective assistance

of counsel when his counsel failed to request and secure funding for brain imaging scans to support

their mitigation presentation.[73/]  Fifth, Trimble says that he was denied the effective assistance of

counsel when his attorneys failed to present evidence of his capacity to adapt to prison life and

aspects of his good character.[74/]  Finally, Trimble also claims that he received ineffective assistance

of counsel when defense counsel failed to adequately prepare and present the mitigation testimony

of Dr. Robert Smith, a clinical psychologist.[75/]  The Warden opposes relief on all grounds because,

he says, the judgement and sentence are valid.[76/]

        Trimble also moved this Court for an order to convey him to the Ohio State University

Medical Center to have a Positron Emission Topography ("PET") scan performed[77/], and, similarly,

for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2).[78/]  In earlier orders, the Court denied

these motions.  This Court lacks jurisdiction or authority to order Trimble's motion for a conveyance

for a PET scan[79/] and declines to certify the issue for interlocutory appeal.[80/]  The Court denied

---

[72/][Doc. 19 at 49.]

[73/][Doc. 19 at 55.]

[74/][Doc. 19 at 47.]

[75/][Doc. 19 at 73.]

[76/][Doc. 25.]

[77/][Doc. 24.]

[78/][Doc. 58.]

[79/][Doc. 30 at 3-4; Doc. 36.]

[80/][Doc. 41.]

Case No. 5:10-CV-00149
Gwin, J.

Trimble's motion for an evidentiary hearing because the record refutes Trimble's ineffective assistance of counsel claim.[81]  The Court addresses Trimble's remaining claims in turn.

## II. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")[82], governs a federal court's review of a state prisoner's habeas corpus petition.  AEDPA limits federal review to only those claims in which a petitioner contends that he is in custody in violation of the Constitution, laws, or treaties of the United States.[83]  And a federal court cannot grant a habeas petition for any claim that the state court adjudicated on the merits unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[84]

To justify any grant of habeas relief, "a federal court must find a violation of law 'clearly established' by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision."[85]  Furthermore,

> under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

---

[81]/[Doc. 64.]

[82]/Pub. L. No. 104-132, 110 Stat. 1214 (1996); codified at 28 U.S.C. § 2254.

[83]/28 U.S.C. § 2254(a).

[84]/28 U.S.C. § 2254(d).  *See also Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

[85]/*Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

Case No. 5:10-CV-00149
Gwin, J.

unreasonably applies that principle to the facts of the prisoner's case.[86]

The Sixth Circuit holds that, even if a federal court could determine that a state court incorrectly applied federal law, the court still should not grant relief unless it also finds that the state court ruling was unreasonable.[87]

But, where the state court did not adjudicate a federal constitutional claim on the merits, AEDPA deference does not apply.[88]  In such cases, a federal court applies the pre-AEDPA standard of review and reviews questions of law de novo and questions of fact for clear error.[89]  Nonetheless, "when a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim . . . the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits."[90]  The same rule applies "when the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas proceeding."[91]

### III.  Non-Use of Brain Scans

The Court begins where its previous order left off:  Trimble's fourth, fifth, and sixth claims for relief all say that his trial counsel was unconstitutionally ineffective.  To qualify for habeas corpus relief based on the ineffective assistance of counsel, *Strickland v. Washington* requires two showings:

---

[86]/*Williams*, 529 U.S. at 412-13.

[87]/*Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

[88]/*Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009); *Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008).

[89]/*Evans*, 575 F.3d at 564; *Brown*, 551 F.3d at 430; *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

[90]/*Johnson v. Williams*, No. 11-465, 2013 WL 610199, at *3 (2013) (citing *Harrington v. Richter*, 131 S. Ct. 770 (2011)).

[91]/*Id.*

Case No. 5:10-CV-00149
Gwin, J.

> First, the defendant must show that counsel's performance was deficient.  This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes
> both showings, it cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result unreliable.[92]

In his fourth ground for relief, Trimble says that "defense counsel rendered ineffective assistance of counsel by failing to request and secure an MRI and/or PET scan to support their mitigation presentation" in violation of his Sixth and Fourteenth Amendment rights.  In summary, Trimble argues that he may have suffered organic brain injury from his methamphetamine use and the scans might have supported this argument.

This Court considered this issue in an earlier opinion and does not revisit it here.[93]  As the Court has already explained, the record refutes Trimble's ineffective assistance of counsel claim on both *Strickland* prongs.  Trimble cannot show deficient performance, because it was reasonable for Trimble's trial counsel to decide to follow his retained experts' lead and not request the tests.[94]  As the Supreme Court reiterated in *Pinholster*, "*Strickland* itself rejected the notion that the same investigation will be required in every case,"[95] and Trimble shows no clearly established federal law that would require his counsel to order medical evaluations where his medical experts did not request them as necessary to provide adequate opinions.  "Counsel has a duty to make reasonable

---

[92] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[93] [Doc. 64.]

[94] *See Frogge v. Branker*, 286 Fed. App'x 51, 63 (4th Cir. 2008) ("When neither expert indicated to counsel a necessity for neurological testing, it was then reasonable for counsel to rely on their experts . . . .") (internal citations and quotations omitted).

[95] *Cullen v. Pinholster*, 131 S.Ct. 1388, 1406-07 (2011).

-13-

Case No. 5:10-CV-00149
Gwin, J.

investigations *or* to make a reasonable decision that makes particular investigations unnecessary."[96/]

Trimble's trial counsel retained experts who fully appreciated the scope of Trimble's history with drugs, experts who did *not* ask defense counsel to obtain the tests.[97/]  Counsel cannot be adjudged constitutionally deficient on the basis of their reasonable deference to those experts, particularly under the "strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."[98/]

Likewise, the record shows that Trimble cannot prevail on the second *Strickland* prong.  He cannot establish that he was prejudiced by counsel's failure to secure funding for the tests.  Perhaps most importantly, Trimble offered significant testimony–much of it not rebutted–that methamphetamine use can result in psychological damage.

In arguing that the brain scans would have helped his case, and as he did before the state court of appeals,[99/] Trimble exclusively relies on a statement in the affidavit of one of his experts, Dr. Robert Smith.  Dr. Smith filed the statement to support Trimble's post-conviction motions.  In the statement, Dr. Smith, a psychologist, speculates that MRI/PET scan results "*could* have been

---

[96/]*Strickland*, 466 U.S. at 691 (emphasis added).

[97/]As the trial court observed, denying Trimble's post-conviction motion, "[n]one of the four experts who examined [Trimble] requested these tests and all were able to render adequate opinions as to his conduct."  [App'x 1 at 3476.]  Despite his hypothesis as to what the unordered tests might have revealed, nowhere does Dr. Smith suggest that he asked for an MRI or PET scan.  Nor did Dr. Smith, either in his trial testimony or his post-conviction affidavit, suggest that an MRI or a PET scan was necessary for adequate diagnosis and testimony.

[98/]*Strickland*, 466 U.S. at 689-90.  Moreover, any evidence Trimble might introduce at a federal evidentiary hearing would neither disturb that presumption nor the result. "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) *on the record that was before that state court.*"  *Pinholster*, 131 S.Ct. at 1400 (emphasis added).

[99/][App'x 1 at 3789.]

-14-

Case No. 5:10-CV-00149
Gwin, J.

helpful in documenting abnormalities in his brain structure."[100]  This inconclusive statement falls

well short of meeting *Strickland*'s requirement that a claimant "show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."[101]  This standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different

result."[102]  Even if the tests came back as Trimble hoped and confirmed physical abnormalities, Dr.

Smith's statement only supports the conclusion that a different result would be *conceivable*.[103]  As

the "record refutes [Trimble's] factual allegations or otherwise precludes habeas relief," the Court

denies Trimble's fourth claim for relief.[104]

### IV. Counsel's Decision Not to Present Character Evidence During Mitigation

In his fifth ground for relief, Trimble says that his trial counsel rendered ineffective assistance

by "fail[ing] to investigate, prepare, and present mitigating evidence regarding Trimble's character,

history, and backgrounds, including his ability to adapt to confinement."[105]  In particular, Trimble

says that his attorneys should have called Sergeant Gregory Johnson, the transport officer who

brought Trimble to and from the jail, that they should have presented evidence of Trimble's good

---

[100][App'x 1 at 2548 (emphasis added).]

[101]*Strickland*, 466 U.S. at 694.

[102]*Harrington*, 131 S. Ct. at 791.

[103]In addition to the possibility that the hypothesized tests would not document any helpful abnormalities, there is no showing of a substantial likelihood that with the benefit of the tests, the jury would have reversed its balance of aggravating and mitigating factors. The jury had been presented with ample evidence of Trimble's extensive drug use—Dr. Smith diagnosed Trimble as a substance abuser with alcohol and methamphetamine dependence, and his testimony recounted in detail the long-term nature, scope, and behavioral consequences of his methamphetamine addiction. [App'x 5 at 7474-7490.] Trimble's drug dependence and abuse was given mitigating weight both by the trial court, [App'x 1 at 1920-21,] and upon review by the Ohio Supreme Court, *Trimble*, 911 N.E.2d at 284-86, but were outbalanced by the aggravating factors. There is no persuasive showing that further documenting the effects of his long-term drug abuse would have made any difference.

[104]*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

[105][Doc. 49 at 83.]

-15-

Case No. 5:10-CV-00149
Gwin, J.

character, and that they should have offered photographs of Trimble with Renee and Dakota Bauer.[106/]  The Warden counters that Trimble's attorneys "completed a thorough investigation in preparation for mitigation," and so "their actions are presumed strategic."[107/]  The Warden also says that "due to the brutal and senseless nature of the crimes, it would be pure speculation for any finding of prejudice."[108/]

The Ohio Court of Appeals, the last court to evaluate this claim, held that "[t]he trial court did not abuse its discretion in finding that the decision not to call Sergeant Johnson or to admit the transport logs was a trial-strategy decision and, thus, Trimble has not advanced a meritorious claim of ineffective assistance of counsel."[109/]  It also determined that

> [s]ince trial counsel presented evidence regarding all of the topics that these proposed [character] witnesses would have testified to, trial counsels' performance was not deficient for failing to call these additional witnesses.  Moreover, for the same reasons, Trimble has not demonstrate that he was prejudiced by trial counsels' failure to call these witnesses.[110/]

Because the Court finds that this decision was not an unreasonable application of *Strickland*, the Court denies relief on this claim.  The Court agrees that counsel's performance was not deficient.

The Constitution requires "reasonable investigation" before making "strategic choices."[111/]  When considering a claim of ineffective assistance of counsel, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls

---

[106/][Doc. 49 at 83, 88.]

[107/][Doc. 28 at 77.]

[108/][Doc. 28 at 77.]

[109/][App'x 1 at 3783.]  The Warden concedes that this claim has been properly preserved for review.  [Doc. 28 at 76.]

[110/][App'x 1 at 3787.]

[111/]*Sowell v. Anderson*, 663 F.3d 783, 791 (6th Cir. 2011).

-16-

Case No. 5:10-CV-00149
Gwin, J.

within the wide range of reasonable professional assistance; that is, the defendant must overcome

the presumption that, under the circumstances, the challenged action 'might be considered sound trial

strategy.'"[112/]  Trimble asserts no deficient investigation, he questions only his attorney's choices of

what evidence to present during the mitigation phase.

Given Trimble's history of domestic violence and past criminal convictions, trial counsel

reasonably decided to avoid putting Trimble's character in issue.  Prosecutors repeatedly sought to

impugn Trimble's character by introducing evidence of his prior convictions and domestic violence.

At the close of direct examination of Trimble's mother, the prosecutor stated his "intention to inquire

as to past criminal conduct in the cross examination of this witness."[113/]  Trimble's counsel then

explained that his defense team deliberately avoided putting Trimble's character in evidence to

foreclose this kind of questioning:

> We have been very careful with respect to the types of questions asked of this witness
> to make sure we didn't make any inquiry with respect to character as related to
> honesty, lack of, or trustworthiness or lack of, or even with respect to whether or not
> his conduct was consistent or inconsistent with his behavior pattern.  So we have a
> right to put in evidence with respect to history of this accused, character if we choose
> but we chose not to, and other defense relevant to his life.  We don't think we put
> character in at all.  We know the State is desperate to try to get in this evidence but
> we didn't open the door for them.[114/]

*Strickland* recognized that in some circumstances "the decision not to seek more character

or psychological evidence than was already in hand" can be "reasonable."[115/]  Here, Trimble's

attorneys obtained character evidence that could have supported him, but determined that it risked

---

[112/]*Strickland*, 466 U.S. at 689.

[113/][App'x 5 at 7244.]

[114/][App'x 5 at 7244.]

[115/]*Strickland*, 466 U.S. at 699.

-17-

Case No. 5:10-CV-00149
Gwin, J.

more damage than good.  That the prosecution repeatedly sought to introduce such evidence suggests just how damaging it might have been.  Trimble's counsel's work to avoid this evidence was a reasonable strategic decision.[116]

The same is true of Trimble's defense team's decision not to seek admission of transit logs produced by Sergeant Johnson that might have shown Trimble's capacity to adapt to confinement. Trimble correctly says that "[t]he Supreme Court recognized future adaptability to prison life as a mitigating factor."[117]  Yet, that Trimble was constitutionally entitled to present such evidence does not mean that his attorneys were constitutionally required to do so, nor that doing so would have been prudent.  While these logs might have shown Trimble's ability to adapt to confinement, they also would have allowed the prosecution to highlight moments of hostility, particularly towards female officers.[118]  On one occasion, Sheriff's department documents show that "Trimble appeared to be agitated and refused to move" and that he called the female officer a "bitch," the same term he used for Renee Bauer when informing his brother that he had killed her.[119]  On another occasion, they show that Trimble refused to obey a female officer's instruction not to take his cup of water out to the jail exercise yard, and later, to return to his cell.[120]  Given Trimble's history of domestic violence, the bruises on Renee Bauer's body, and that two of the victims in this case were women,

---

[116]*Cf. Wright v. Bell, 619 F.3d 586, 596-97 (6th Cir. 2010)* (finding that it was not unreasonable for counsel to weigh potentially damaging testimony against potentially beneficial testimony in determining whether to present certain testimony).

[117][Doc. 49 at 85 (citing *Ayers v. Belmontes, 549 U.S. 7, 15 (2006)*; *Skipper v. South Carolina, 476 U.S. 1 (1986)*; *Davis v. Coyle, 475 F.3d 761, 771 (6th Cir. 2007)*).]

[118]These records also show, albeit likely innocuously, that Trimble sought to watch the television program "Prisonbreak."  [App'x 3 at 2571.]

[119][App'x 3 at 2506, 2511, 2512.]  See *Trimble, 911 N.E.2d at 251.*

[120][App'x 3 at 2347-48.]

-18-

Case No. 5:10-CV-00149
Gwin, J.

Trimble's counsel may have opted to minimize the prosecution's attempts to portray Trimble as aggressive towards women.  Such a decision is reasonable.

Moreover, Trimble's attorneys did elicit testimony from Trimble's mother that Trimble "has a lot to offer to people who are in prison" because "he can teach them a trade to make a living when they get out."[121]  She also said that he "made a difference in one young man's life in jail" by "br[inging] him to Christ."[122]  Trimble's counsel may have determined that this testimony was likely to be equally persuasive in convincing jurors that Trimble could adapt to confinement without the liabilities attached to a debate over his behavior while incarcerated.  This decision was not unreasonable.

Trimble's claim that his counsel should have presented photographs of him with Renee and Dakota Bauer is equally unavailing.  While photographs of Trimble with his victims might have had the capacity to humanize him, the defense could reasonably fear putting photographs of the victims in front of the jury.  Indeed, the prosecution incorporated many of the exhibits from its case-in-chief, including photographs of Renee and Dakota Bauer, suggesting that they thought that such photos furthered their case, not Trimble's.[123]  Furthermore, even assuming that photographs of Trimble with Renee and Dakota Bauer may have served to humanize him, this was not the only way to humanize Trimble or his relationship with Renee and Dakota Bauer.  Trimble's mother discussed Trimble's interactions with them.  She recalled having dinner with Trimble and the Bauers and that Trimble repaired Dakota's motorbike.[124]  The decision not to use the photographs was reasonable trial

---

[121]/[App'x 5 at 7243.]

[122]/[App'x 5 at 7243.]

[123]/[App'x 5 at 7184-85; App'x 2 at 1-5.]

[124]/[App'x 5 at 7236.]

Case No. 5:10-CV-00149
Gwin, J.

strategy in light of the potential for prejudice.

As Trimble has not shown that the Ohio Court of Appeals unreasonably determined that counsel's performance was not deficient, the Court denies Trimble's fifth claim for relief.

### V. Counsel's Preparation of Doctor Smith

In his sixth claim for relief, Trimble says that his "right to effective assistance of counsel was violated by defense counsel's failure to adequately prepare and present Dr. Smith's testimony for the jury at the mitigation phase" in violation of his Sixth and Fourteenth Amendment rights.[125/] Specifically, Trimble says that his lawyers, apparently aware of a study comparing the brains of methamphetamine users and schizophrenics, should have prepared Dr. Smith "to testify to the existence and substance of these studies prior to trial."[126/]  The Warden responds that Trimble's "counsel was under no constitutional obligation to inform their expert" of this study, and calls his claim that the failure to introduce evidence of this study resulted in prejudice "incredibl[e]."[127/]

The Ohio Court of Appeals considered this claim and determined that the studies "submitted by Trimble in support of this argument lack credibility because they are unauthenticated and are hearsay.  Thus, Trimble has not met his burden of demonstrating that he was prejudiced by this perceived error.  Accordingly, his claim for ineffective assistance of counsel lacks merit."[128/]  While the Court admits some trouble understanding the Ohio court's logic, the Ohio court's conclusion that Trimble was not prejudiced by his attorneys' failure to deliver these studies to Dr. Smith was

---

[125/][Doc. 19 at 73.]

[126/][Doc. 19 at 74.]

[127/][Doc. 28 at 106.]

[128/][App'x 1 at 3793.]

-20-

Case No. 5:10-CV-00149
Gwin, J.

reasonable.[129]

Assessing the value of this proposed testimony, the Court agrees that Trimble has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[130] "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."[131] The testimony that Trimble says he could have offered would have discussed studies comparing brain damage in schizophrenics and methamphetamine users.  Dr. Smith's testimony, however, extensively discussed the effects of long term methamphetamine use and the relationship between methamphetamine use and schizophrenia.  He explained that

> people who have been using alcohol for a long period of time or methamphetamine for a long period of time, the fact that they need more of it does not mean that it is not impairing them.  They will have difficulties with mood swings, difficulties making decisions, problem solving.  They are going to have difficulties as a result of those drugs that will then translate into changes in their behavior, impulsivity, reactionary kinds of things that they would not do if they were not under the influence of the substance.[132]

Later in his testimony, Dr. Smith testified that

> [t]here was research done in the early sixties and seventies where . . . [w]hat they found is that they could use stimulants like methamphetamine and could create the same symptoms you see in schizophrenia.  When people use large amount of

---

[129] The Ohio Court of Appeals' determination is somewhat logically incoherent:  If testimony about the studies was inadmissible hearsay, then presumably counsel's failure to offer such testimony was not deficient performance under *Strickland*'s first prong.  *Strickland*'s second prong, on the other hand, pertains to prejudice resulting from any deficient performance.

[130] *Strickland*, 466 U.S. at 694.

[131] *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).

[132] [App'x 5 at 7485.]

-21-

Case No. 5:10-CV-00149
Gwin, J.

> methamphetamine over extended period and go without sleep they can begin to have
> hallucinations, seeing or hearing things that are not real, illusions—not quite as
> severe as a hallucination but they start to see things in shadows, they start to think
> they are hearing their name, minor types of things, but not real.  They can begin to
> become paranoid, feeling that other people are talking about them, plotting against
> them, planning to hurt them.  They can become very defensive because in their mind
> this is real. . . .  So that the individual using the methamphetamine can have
> significant changes in their emotions so that they can have mood swings in their
> thoughts, in that they can believe that people are talking and plotting against them
> and it can then influence their actions because they will act based upon these
> thoughts and emotions because they are real to them, where, in fact, they are being
> caused by the drug.[133]

Based on this testimony, jurors could have concluded that Trimble was suffering from effects similar to schizophrenia at the time of the killings.  Trimble does not explain any substantial difference between the proposed testimony about the studies and the testimony that the jury received. Indeed, when Dr. Smith submitted an affidavit outlining what he perceived to be the weaknesses of his testimony, he did not even mention these studies.[134]  Since Trimble presents no additional inferences regarding brain damage that the proposed evidence would have allowed the jury to draw, he has not shown prejudice under *Strickland*.[135]

At best, the proposed studies would have shown the jury that the long term effects of methamphetamine use facilitated the kinds of organic brain damage observed in schizophrenics.  But evidence comparing the brains of methamphetamine users to schizophrenics would not have provided conclusive evidence that Trimble suffered such damage.  Such inconclusive evidence of organic brain damage cannot support a *Strickland* claim.[136]

---

[133][App'x 5 at 7490-92.]

[134][App'x 1 at 2546-48.]

[135]*See Clark v. Mitchell*, 425 F.3d 270, 287 (6th Cir. 2005).

[136]*See Smith v. Mitchell*, 348 F.3d 177, 201 (6th Cir. 2003).

-22-

Case No. 5:10-CV-00149
Gwin, J.

  This is not the situation of *Frazier v. Huffman*, where counsel failed entirely "to investigate and present evidence of his brain impairment."[137]  Instead, the allegation here is that counsel failed to give additional information that might have allowed the expert to supplement the testimony that he had already given.  Such cumulative evidence is insufficient to support a claim under *Strickland*'s second prong.[138]  The Court follows this analysis today and denies relief on Trimble's sixth claim for relief.

## VI. Display of Firearms

  In addition to the foregoing three claims for relief based on the ineffective assistance of counsel, Trimble asserts three claims to relief based on trial errors.  On each claim, the Warden asserts that Trimble has procedurally defaulted the claim and is not otherwise entitled to relief.  The Court considers these claims in turn.

### A. Background

  With his second ground for relief, Trimble says that the admission and display of nineteen firearms not used in the killings violated his due process rights guaranteed under the Fourteenth Amendment.[139]  The trial court had previously severed the weapons-under-disability charge brought as Count 22 of the indictment.[140]  Thus these weapons were of little or no probative value to the crimes charged.  Nonetheless, the trial court admitted these nineteen firearms not used in the killings, including numerous pistols, rifles, assault rifles, a shotgun and a submachine guns along with a

---

[137]343 F.3d 780, 794 (6th Cir. 2003).

[138]*See Smith*, 348 F.3d at 200-02.

[139][Doc. 19 at 42.]

[140][App'x 1 at 1267.]

Case No. 5:10-CV-00149
Gwin, J.

significant quantity of ammunition magazines.[141]/  Trimble's lawyer described the result,

> that the State of Ohio has set up on two long cafeteria tables adjacent to the jury box
> and that all of the guns that have been marked and identified and admitted have been
> lined up sequentially for display along those two tables which almost take up three
> quarters of the jury box.  Members of the jury in the front row are so close to them
> they can actually reach over the rail and touch the weapons.[142]/

The weapons were removed from the courtroom shortly thereafter.[143]/  Nonetheless, over objection,

all of the weapons were admitted and went to the jury during deliberations in the guilt phase.[144]/

They were not readmitted in the penalty phase.[145]/

Trimble objected that these firearms were irrelevant, as the state agreed that they were not

used in the killings.  The trial court overruled the objection.[146]/  The Ohio Supreme Court considered

the issue and found the firearms admissible on a single basis: to rebut Trimble's claim that the

Positano shooting had been accidental.[147]/  It also held that even if "the firearms should not have been

admitted, any error was harmless."[148]/

Trimble now says that these determinations were "unreasonable."[149]/  He says that the

---

[141]/[App'x 2 at 198-224; App'x 5 at 4844-4855.]

[142]/[App'x 5 at 4859-60.]

[143]/[App'x 5 at 4860.]

[144]/[App'x 5 at 7076-77.]

[145]/[App'x 5 at 7184-86.]

[146]/*Id*.

[147]/*Id*.

[148]/*Id*.

[149]/[Doc. 19 at 44-45.]

-24-

Case No. 5:10-CV-00149
Gwin, J.

admission of the firearms was "unduly prejudicial" in violation of *Payne v. Tennessee*.[150]  He also

says that the error was not harmless "because it overlooked the legitimate fact questions that existed

for the jury with respect to the *mens rea* elements of the aggravated murder charges."[151]

In response, the Warden says that Trimble procedurally defaulted this issue because the

argument was not "fairly presented" to the Ohio Supreme Court.[152]  He also says that the Ohio

Supreme Court's determination that admission of the weapons was not unduly prejudicial is

reasonable and therefore should not be disturbed under 28 U.S.C. § 2254(d)(1).[153]

**B.  Procedural Default**

"A petitioner must fairly present to the state courts either the substance of or the substantial

equivalent of the federal claim that he is presenting to a federal habeas court."[154]  "To fairly present

a claim to a state court a petitioner must assert both the *legal* and factual basis for his or her claim.[155]

To determine whether a federal legal claim has been fairly presented to the state court, a federal

habeas court considers whether:

> 1) the petitioner phrased the federal claim in terms of the pertinent constitutional law
> or in terms sufficiently particular to allege a denial of the specific constitutional right
> in question; 2) the petitioner relied upon federal cases employing the constitutional
> analysis in question; 3) the petitioner relied upon state cases employing the federal

---

[150]/[Doc. 19 at 42.](citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

[151]/[Doc. 19 at 45-46.]  As proof the such dispute existed, Trimble notes that the trial court gave a jury instruction for a lesser-included offense, which "is required *only* where the evidence presented at trial *would reasonably support* both an acquittal on the crime charged and a conviction upon the lesser included offenses."  [Doc. 19 at 45-46.] (quoting *State v. Smith*, 780 N.E.2d 221, 228 (Ohio 2002)) (emphasis by Petitioner).

[152]/[Doc. 28 at 56.]

[153]/[Doc. 28 at 58.]

[154]/*Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004).

[155]/*Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

-25-

Case No. 5:10-CV-00149
Gwin, J.

constitutional analysis in question; or 4) the petitioner alleged "facts well within the mainstream of [the pertinent] constitutional law."[156/]

Trimble's briefing to the Ohio Supreme Court on his seventh claim for relief, while somewhat cursory, satisfies this standard.[157/]  Trimble's brief to the Ohio Supreme Court said that

> [t]he trial court permitted an atmosphere repugnant to appellant's right to a fair trial by admitting evidence of guns owned by the appellant but not used in the offenses before the jury and the court made statement to the gallery of people viewing the trial which the jury heard all in violation of appellant's Fifth, Sixth and Fourteenth Amendment rights. [158/]

In support, he cited four United States Supreme Court cases.[159/]  He quoted *Taylor v. Kentucky* for the proposition that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial and not on grounds of official suspicion, indictment, continued custody or other circumstances not adduced as proof at trial."[160/]  He then analogized the display of the firearms to display of a defendant in "prison clothes" or "shackles."[161/]  Both, he said, "create[] such a prejudicial atmosphere that the Appellant's rights to a fair trial were violated."[162/]  That the state chose to ignore, rather than respond to, Trimble's claim that the firearms

---

[156/]*Hicks*, 377 F.3d at 553 (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).

[157/]The Warden accurately states that Trimble's sixth ground for relief before the Ohio Supreme Court only contained citations to state law.

[158/][App'x 1 at 2072.]

[159/][App'x 1 at 2073-74] (citing *Taylor v. Kentucky*, 436 U.S. 478 (1978); *Estelle v. Williams*, 425 U.S. 501 (1976); *Illinois v. Allen*, 397 U.S. 337 (1970); *Dick v. Missouri*, 544 U.S. 622 (2005)).

[160/][App'x 1 at 2703] (quoting *Taylor*, 436 U.S. at 485).

[161/][App'x 1 at 2073-2074.]

[162/][App'x 1 at 2073-2074.]

Case No. 5:10-CV-00149
Gwin, J.

were unconstitutionally prejudicial does not mean that he did not fairly present the claim.[163]  A

subject header and citation to four federal cases sufficiently alerted the state court to the federal

claim.[164]

   This is not, however, to say that AEDPA deference necessarily applies.  AEDPA deference

applies only "to any claim that was adjudicated on the merits in State court proceedings."[165]  The

Ohio Supreme Court considered whether "the courtroom display of firearms and ammunition that

were not used in the killings was unduly prejudicial."[166]  It found it "highly questionable whether

the trial court should have allowed this evidence to be displayed before the jury in court or during

deliberation," but that "the trial court did not abuse its discretion in doing so."[167]  It also found any

error "harmless."[168]

   That the Ohio Supreme Court considered the prejudicial impact of the guns creates a strong,

but rebuttable, presumption that it evaluated Trimble's *federal constitutional* claim and not a state

evidence law question.[169]  Nonetheless, "if a provision of the Federal Constitution or a federal

precedent was simply mentioned in passing in a footnote or was buried in a string cite" then "the

---

[163] [App'x 1 at 2248-2251.]

[164] *See Dye v. Hofbauer*, 526 U.S. 1, 4-5 (2005).

[165] 28 U.S.C. § 2254(d).

[166] *Trimble*, 911 N.E.2d at 264.

[167] *Id*.

[168] *Id*.

[169] *See Johnson v. Williams*, No. 11-465, 2013 WL 610199, at *3 (Feb. 20, 2013) (A "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits . . . when the state court addresses some of the claims raised by a defendant but not a claim that is later raised in a federal habeas petition.").

Case No. 5:10-CV-00149
Gwin, J.

presumption that the federal claim was adjudicated on the merits may be rebutted."[170]  Likewise, if

the state court considered the impact in terms of a state standard of prejudice and "the state standard

is *less protective*" than the federal standard, this too may rebut the presumption.[171]

Inexplicably, the Ohio Supreme Court cited no case law to support its finding that the display

of the firearms was not unduly prejudicial.[172]  It simply found that "the trial court did not abuse its

discretion in" admitting the weapons into evidence, and it performed a harmless error analysis.[173]

The extent of a trial court's discretion is a matter of state law, but many constitutional trial errors *are*

subject to harmless error review.[174]  Given the "strong" presumption directed by the Supreme Court,

this Court will apply AEDPA deference to Trimble's claim that the trial court's admission of the

weapons was irrelevant and unconstitutionally prejudiced Trimble.

## C. Merits

As an initial matter, the Court notes the exceedingly limited probative value of these

firearms.  The Ohio Supreme Court found them admissible "to show that [Trimble] was familiar

with using such weapons.  Thus, the state was entitled to use such evidence and present such

arguments in rebutting defense claims that Trimble had accidentally shot Positano."[175]  Under this

---

[170] *Id.* at *8.

[171] *Id.*  Of course, evaluating whether state law is less protective than federal law will often  require evaluating the merits of the federal law claim.  If a state court finds no violation of state law, then to determine whether federal law is more protective, the federal court will have to evaluate the merits of the constitutional claim to determine whether federal law provides protection in this situation where state law does not.

[172] *See Trimble*, 911 N.E. 2d at 264.

[173] *Id.*

[174] *See Ege v. Yukins*, 485 F.3d 364, 375 n5 (6th Cir. 2007).

[175] *Trimble*, 911 N.E.2d at 263.

Case No. 5:10-CV-00149
Gwin, J.

logic, the jury should have inferred from Trimble's familiarity with a pump-action shotgun or a bolt-action rifle that he would not accidentally misfire a pistol while holding the hammer back. But neither a bolt-action rifle nor a pump-action shotgun has a hammer mechanism like a semi-automatic pistol. Furthermore, the state could have established Trimble's familiarity with a wide range of firearms by delving into his military background, where he presumably received training on semiautomatic pistols such as the Sig Sauer 9-mm that he used to kill Positano. Instead of showing "familiarity with firearms," the firearms more likely invited the jury to conclude the Trimble was a violent man, predisposed to commit a shooting rampage like the one perpetrated in this case.

Nonetheless, AEDPA sharply limits this Court's review of this claim: The Court reviews not whether the evidence should have been admitted under the state rules of evidence, but only whether its admission denied Trimble a fair trial in violation of his due process rights. "[O]nly in extraordinary cases will an error in the application of state rules of evidence rise to the level of a due process violation in a federal habeas proceeding."[176] Generally, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[177] To warrant habeas relief, a state evidentiary ruling must be "so egregious that it results in a denial of fundamental fairness."[178] A petitioner must show that the state-court ruling "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[179] In light of AEDPA, this standard requires Supreme Court precedent suggesting that the kind of erroneous

---

[176]/*Schoenberger v. Russell*, 290 F.3d 831, 836 (6th Cir. 2002).

[177]/*Ege*, 485 F.3d at 375 (quoting *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)).

[178]/*Id.* (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)).

[179]/*Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)).

-29-

Case No. 5:10-CV-00149
Gwin, J.

evidentiary ruling of which petitioner complains is of such a fundamental nature.[180]

Here Trimble's argument falters:  He offers no cases suggesting that the erroneous admission of a weapon rises to the level of unconstitutional prejudice—much less a United States Supreme Court case.  In the lone case in this circuit of which this Court is aware, the Sixth Circuit determined, in an unpublished opinion, that the questionable admission of a gun found in the defendant's car did not violate the due process clause.[181]  Likewise, the First and Seventh Circuits have held that the prejudice arising from the erroneous admission of guns and ammunition does not rise to a due process violation where the government focuses on its theory of the case.[182]  From these cases it appears reasonable—although not necessarily correct—to extrapolate that the admission of nineteen weapons in Trimble's case was not unconstitutional.  On cross examination, defense counsel clarified that these weapons were not used in the killings of Renee and Dakota Bauer or Sarah Positano.[183]  While unnecessary to Ohio's case against Trimble, the Court concludes that the admission of these firearms should not be disturbed.

Moreover, even erroneously-admitted, unconstitutionally-prejudicial evidence is subject to harmless error analysis.[184]  And thus, on AEDPA review, this Court must determine whether it was

---

[180]/*See* *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007); *Bugh*, 329 F.3d at 512.  The cases petitioner cited in his brief to the Ohio Supreme Court, incidentally, suggest some of the errors that fall within this category: permitting the reading of the indictment at trial absent sufficient limiting instructions, *see* *Taylor*, 436 U.S. at 487-88, compelling a defendant to appear in prison garb, *see* *Estelle*, 425 U.S. at 512-13, and routinely shackling a defendant during the guilt phase of his trial, *see* *Deck*, 544 U.S. at 626.

[181]/*See* *Hudson v. Lafler*, 421 Fed. App'x 619, 628 (6th Cir. 2011).

[182]/*See* *United States v. Perrotta*, 289 F.3d 155, 166 (1st Cir. 2002); *Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001).

[183]/[App'x 5 at 5301-06.]

[184]/*Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).

-30-

Case No. 5:10-CV-00149
Gwin, J.

unreasonable for the Ohio Supreme Court to conclude that the weapons were not a "a crucial or critical factor in the jury's decision to convict Petitioner."[185/]  It was not.  The evidence in this case, including a recorded confession by Trimble, testimony from Trimble's mother of his confession to her, and a recorded 9-1-1 call apparently made during the time Trimble shot Positano, suffices to support the verdict.  The Ohio Supreme Court's determination was not unreasonable when it found that the jury would have found Trimble guilty even if these firearms had not been admitted.

While finding that the Ohio Supreme Court could reasonably find insufficient prejudice in light of all the evidence, the Court notes that psychology "[r]esearchers have known for over 30 years that the mere presence of a weapon leads people to behave more aggressively than they do in situations where no weapons is present."[186/]  In the foundational study,

> 100 male university students received either 1 or 7 shocks, supposedly from a peer, and were then given an opportunity to shock this person.  In some cases a rifle and revolver were on the table near the shock key.  These weapons were said to belong, or not to belong, to the available target person.  In other instances there was nothing on the table near the shock key, while for a control group 2 badminton racquets were on the table near the key.  The greatest number of shocks was given by the strongly aroused S[ubject]s (who had received 7 shocks) when they were in the presence of the weapons.  The guns had evidently elicited strong aggressive responses from the aroused men.[187/]

The trial court allowed nineteen firearms that had not been used in the killings into the jury room.  The aggression-priming effect of these weapons was undoubtedly significant, even if not unconstitutional.

---

[185/]*Id.*

[186/]*See* Bruce D. Bartholow, Craig A. Anderson, Nicholas L. Carnagey, & Arlin J. Benjamin, Jr., *Interactive Effects of Life Experience and Situational Cues on Aggression: The Weapons Priming Effect in Hunters and Nonhunters*, 41 J. of Experimental Soc. Psychology 48 (2005).

[187/]Leonard Berkowitz and Anthony LePage, *Weapons as Aggression-Eliciting Stimuli*, 7 J. of Personality and Soc. Psychology, 202, 202 (1967).

Case No. 5:10-CV-00149
Gwin, J.

## VII. Prosecutorial Misconduct

In his third ground for relief, Trimble says that prosecutorial misconduct violated his right to a fair and reliable capital sentencing hearing as guaranteed under the Due Process Clause of the Fourteenth Amendment.[188]  Responding, the Warden says that this ground was not fairly presented to the Ohio Supreme Court, and thus Trimble has procedurally defaulted.[189]  The Warden also says that the lines of questioning that Trimble challenges were not improper, and, that any error was harmless.[190]

## A. Background

Trimble says that the prosecutor repeatedly sought information about Trimble's bad character during the penalty phase of the trial.  He says this violated his due process rights.[191]  In particular, he points to the state's questions to his mother and a doctor who testified during the penalty phase.[192]

During the questioning of Trimble's mother, the prosecutor sought to admit evidence of Trimble's court martial, sentence, and discharge from the Air Force and sought to admit evidence of domestic violence in Trimble's marriage to Kelly Penn.  The prosecutor asked,

> Q:        You mentioned that your son left the Air Force in 1985, is that correct?
>
> A:        Yes, sir.
>
> Q:        Were you aware that he left by court martial?

---

[188][Doc. 19 at 49.]

[189][Doc. 28 at 66-69.]

[190][Doc. 28 at 69-75.]

[191][Doc. 49 at 49.]

[192][Doc. 49 at 49.]

Case No. 5:10-CV-00149
Gwin, J.

| | | |
|---|---|---|
| [Defense Counsel]: | | Objection. |
| A: | No, sir. | |
| THE COURT: | | Overruled on that. |
| Q: | | Were you aware he was discharged with a bad conduct discharge? |
| [Defense Counsel:] | | Objection. |
| A: | No, sir. | |
| THE COURT: | | Overruled. |
| Q: | | He never told you that? |
| A: | No, sir. | |
| Q: | | Were you aware that he was sentenced to six months hard labor? |
| [Defense Counsel:] | | Objection. |
| THE COURT: | | I'll sustain as to that, the jury is instructed to disregard. |
| [Defense Counsel:] | | I ask to still make a record, Judge. |
| THE COURT: | | You're allowed.  Again, the jury is instructed to totally disregard that.[193]/ |

The prosecutor then sought to inquire into domestic violence in Trimble's first marriage:

| | | |
|---|---|---|
| Q: | | Ma'am, you testified also you were aware of your son's marriage to a Kelly, is that her name? |
| A: | | Yes, sir. |
| Q: | | And were you aware under what circumstances that marriage ended? |
| A: | | They got a divorce, sir. |
| Q: | | Were you aware of any domestic violence in that? |

---

[193]/[App'x 5 at 7245-46.]

-33-

Case No. 5:10-CV-00149
Gwin, J.

       A:            No, sir.

       [Defense Counsel:]         Objection, Judge.

       THE COURT:           Sustained.[194/]

The court ordered the prosecutor to stop asking about Trimble's bad acts and said that further attempts would "constitute a mistrial."[195/]

       Later in the penalty phase, Trimble called Dr. Robert Smith, a clinical psychologist, to testify about Trimble's addiction to methamphetamine. On cross examination, the trial court permitted the prosecutor to ask Dr. Smith about the information that Dr. Smith relied upon in making his evaluation, including Trimble's history of domestic violence. The trial court did not allow the prosecutor to ask Dr. Smith about Trimble's prior convictions.[196/] The prosecutor then offered testimony that "there was violence in the relationship[]" between Trimble and his ex-wife Kelly Penn.[197/]

       On appeal to the Ohio Supreme Court, Trimble argued that "the cumulative effect of prosecutorial misconduct during the mitigation phase deprived [him] of his right to a fair trial as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution."[198/] He quoted Ohio Supreme Court cases holding that "any egregious error in the penalty phase of a death penalty proceeding, including prosecutorial misconduct, will be cause to vacate the sentence

---

[194/][App'x 5 at 7247.]

[195/][App'x 5 at 7247-48.]

[196/][App'x 5 at 7579-83.]

[197/][App'x 5 at 7584.]

[198/][App'x 1 at 2086.]

Case No. 5:10-CV-00149
Gwin, J.

of death with a subsequent remand to the trial court for a new sentencing procedure."[199] He

continued, "the test for prosecutorial misconduct is whether the conduct complained of deprived the

defendant of a fair trial."[200]

The Ohio Supreme Court considered "whether the remarks were improper and, if so, whether

they prejudicially affected the accused's substantial rights."[201] It explained that "[t]he touchstone

of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'"[202] Applying this

test, the Ohio Supreme Court found the questioning of Trimble's mother about his military discharge

and domestic violence "improper" but "harmless."[203] It likewise found that "[t]he cross-examination

of Dr. Smith about Trimble's domestic violence was irrelevant and improper. Nevertheless, this

testimony did not result in prejudicial error" because it was of "minor significance."[204]

**B. Procedural Default**

The Warden says that "relief is precluded" on this claim because "Trimble does not present

to this Court the same claim he presented to [the] State court."[205] The Warden argues that Trimble

relied upon state law to the Ohio Supreme Court, did not fairly present the federal claim, and so,

cannot now cite federal cases to revive his claim. Responding, Trimble says that the Ohio Supreme

Court must have understood that this was a federal constitutional claim because it cited *Smith v.*

---

[199] [App'x 1 at 2086] (quoting *State v. Thompson*, 514 N.E.2d 407, 421 (Ohio 1987)).

[200] [App'x 1 at 2086] (quoting *State v. Fears*, 715 N.E.2d 136, 143 (Ohio 1999)).

[201] *Trimble*, 911 N.E.2d at 274.

[202] *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

[203] *Id.* at 275-76.

[204] *Id.* at 276-77.

[205] [Doc. 28 at 66.]

-35-

Case No. 5:10-CV-00149
Gwin, J.

*Phillips*, a United States Supreme Court case not even cited in Trimble's own brief.[206/]

A petitioner can raise a federal claim by "reliance upon state cases employing federal constitutional analysis."[207/] But these cases must contain more than "a few brief references" to the constitutional claim.[208/] Nonetheless, "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."[209/]

The Ohio Supreme court cited *State v. Smith* as holding that "the test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights."[210/] *State v. Smith* derived this legal standard from *United States v. Dorr*, a federal case.[211/] The other case cited by the Ohio Supreme Court, *Smith v. Phillips*, explained the legal standard for prosecutorial misconduct that violates due process in yet greater detail.[212/]

---

[206/][Doc. 49 at 54.]

[207/]*Williams*, 460 F.3d at 806 (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

[208/]*McMeans*, 228 F.3d at 682.

[209/]*Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *see also Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("[T]he district court incorrectly determined that habeas claim forty-two was procedurally defaulted, because the state courts adjudicated this claim on the merits on post-conviction review.").

[210/]*Trimble*, 911 N.E.2d at 274 (citing *State v. Smith*, 470 N.E.2d 883, 885 (1984))

[211/]636 F.2d 117 (5th Cir. 1981).

[212/]In *Smith v. Phillips*, the Supreme Court reasoned,

Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. In *Brady v. Maryland*, 373 U.S. 83 (1963), for example, the prosecutor failed to disclose an admission by a participant in the murder which corroborated the defendant's version of the crime. The Court held that a prosecutor's suppression of requested evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at

Case No. 5:10-CV-00149
Gwin, J.

A state court's citation to a United States Supreme Court case does not necessarily show that the state court understood that it was evaluating a constitutional claim, especially where the Supreme Court case pertains to harmless error analysis of due process violations.[213/] Here, however, the Ohio Supreme Court's appropriately laid out the then-governing federal legal standard and then applied it. Because, the Ohio Supreme Court reached the merits of Trimble's constitutional claim, Trimble did not default this claim. For this same reason, this Court applies AEDPA deference on review.[214/]

**B. Merits**

The "highly generalized standard for evaluating prosecutorial misconduct set forth in *Darden* [*v. Wainright*]" governs this case.[215/] *Darden* held "that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[216/] Against this standard, this Court finds that the Ohio Supreme Court could reasonably determine that the prosecutor's remarks did not violate this right.

*Darden* considered whether the prosecutor's argument "manipulate[d] or misstate[d] the

---

87.  Applying this standard, the Court found the undisclosed admission to be relevant to punishment and thus ordered that the defendant be resentenced. Since the admission was not material to guilt, however, the Court concluded that the trial itself complied with the requirements of due process despite the prosecutor's wrongful suppression. The Court thus recognized that the aim of due process "is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Ibid.*

455 U.S. at 219 (footnote omitted).

[213/] *Williams, 460 F.3d at 806*.

[214/] *See* 28 U.S.C. § 2254(d)(1).

[215/] *Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)* (citing *Darden v. Wainright, 477 U.S. 168 (1986)*). Although Trimble initially asserted that other cases of the Sixth Circuit governed this case, he now concedes that *Parker* governs this case.  [Doc. 63 at 1.]

[216/] *Id. at 2153* (quoting *Darden, 477 U.S. at 181*) (further citation omitted).

-37-

Case No. 5:10-CV-00149
Gwin, J.

evidence," whether it "implicate[d] other specific rights of the accused," whether "the objectionable content was invited by or was a response to" the defense's case, and whether the purported misconduct ultimately harmed or hurt the petitioner's case.[217/]  The Court looks to these same considerations here.

      At Trimble's sentencing hearing, the prosecution repeatedly sought to introduce evidence of Trimble's bad acts and convictions as evidence of his bad character.  But the trial court restrained the prosecution from eliciting testimony regarding Trimble's prior convictions, and prosecutors introduced only limited testimony regarding Trimble's past domestic violence and the circumstances of his military discharge.  The character evidence invited the jury to decide Trimble's fate based on this character evidence, not the aggravating factors contained within the statutes under which Trimble was convicted.  The Ohio Supreme Court determined that this testimony was irrelevant to the penalty phase under Ohio evidence law.[218/]  As such, the attempts to elicit this testimony tended to mislead the jury and manipulate the evidence.  That the prosecutor sought this testimony repeatedly is especially troubling.[219/]

      Still, the Court finds that the comments do not warrant habeas corpus relief because the Ohio Supreme Court's finding of harmless error was reasonable.  There is no talismanic line between

---

[217/]*Darden*, 477 U.S. at 181-83.  The Warden suggests that these lines of cross examination were not improper because they were "truthful," and truthful cross examination "does not implicate the federal constitution."  [Doc. 28 at 71.]  This is not the law.  For example, the "use of convictions constitutionally invalid under *Gideon v. Wainwright* to impeach a defendant's credibility deprives him of due process of law."  *Loper v. Beto*, 405 U.S. 473, 483 (1972).  So too do "[b]adgering and interrupting a witness, name-calling, predicting that the defendant will lie on the stand, and stating before the jury that the defendant is in need of psychiatric help" deprive a defendant of due process. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

[218/]*Trimble*, 911 N.E.2d at 275, 277.

[219/]*Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) ("When a prosecutor dwells on a defendant's bad character . . . we may find prosecutorial misconduct.").

Case No. 5:10-CV-00149
Gwin, J.

inadmissible evidence of bad acts or bad character and use of such evidence in an unconstitutionally

improper fashion.[220/]  For three reasons, the Court finds that these comments fall in the former

category:  First, these statements were isolated.  Second, the jury may already have inferred that

Trimble had engaged in domestic violence against Renee Bauer on the basis of the bruises on her

body shown during the trial's guilt phase.  Third, the testimony on both Trimble's military discharge

and the domestic violence in his previous marriages were brief in the context of the eleven witnesses

called during the penalty phase.  This testimony created no "'grave doubt' as to the harmlessness"

of this error.[221/]  As such, AEDPA commands deference to the Ohio Supreme Court's determination.

### VII. Juror No. 139

The Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the

right to a speedy and public trial, by an impartial jury."[222/]  "[F]ailure to remove [a] juror for cause

[is] constitutional error under" this standard.[223/]  Trimble says that he was denied this right when the

trial court seated Juror 139 during the penalty portion of the trial.[224/]  In response, the Government

argues that Trimble procedurally defaulted this claim by failing to exhaust his peremptory challenges

and, that even if he has not, the Ohio Supreme Court's determination that Juror 139 could be fair and

---

[220/]*Cf. Blackmon v. Booker*, 696 F.3d 536, 555 (6th Cir. 2012) (differentiating "between state evidentiary error and federal constitutional error").

[221/]*Bates v. Bell*, 402 F.3d 635, 649 (6th Cir. 2005).

[222/]US. Const. amend. VI.

[223/]*Morgan v. Illinois*, 504 U.S. 718, 728 (1992) (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988))

[224/]Trimble says that his "right to a fair and impartial jury was violated by the service of a juror who was biased from pre-trial publicity and biased toward imposing the death penalty without regard for [Trimble's] mitigating evidence" in violation of the Sixth and Fourteenth Amendments to the Constitution."  [Doc. 19 at 32.]

Case No. 5:10-CV-00149
Gwin, J.

impartial was not an unreasonable application of federal law.[225]

Over more than thirty pages of trial transcript, which the Court will quote at length, Juror 139's responses to voir dire show deep inconsistencies.  Selectively quoted, the voir dire shows that the juror "assured the court that he could listen to the evidence, follow the court's instructions and vote for a life sentence if the state failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors."[226]  But it just as easily shows that the juror believed that "if you're guilty, without a reasonable doubt, then if you take somebody's life your life should go—you shouldn't be allowed to live either."[227]

Neither, however, is the appropriate method to evaluate juror bias.  Instead, the habeas court must determine whether it was unreasonable for the Ohio Supreme Court to determine that Juror 139 was not biased based on the entirety of the record.  And the record compels a single conclusion: Upon a finding of guilt, this juror would, in almost all circumstances, vote for execution.  This is not Ohio law.  And even a single juror who holds such views renders a death sentence invalid.[228]

This Court first considers the Warden's claim that Trimble has procedurally defaulted this claim.  After finding three reasons why he has not, the Court then evaluates the merits.  Ultimately, the Court concludes that it was constitutional error to seat Juror 139.

**A. Procedural Background**

The Ohio Supreme Court erroneously found that after Trimble had challenged Juror 139 for

---

[225] [Doc. 28 at 43-44.]

[226] *Trimble*, 911 N.E.2d at 259.

[227] [App'x 5 at 2755.]

[228] *Morgan*, 504 U.S. at 729.

-40-

Case No. 5:10-CV-00149
Gwin, J.

cause, Trimble had an available peremptory challenge but failed to use it to excuse Juror 139.

The trial court originally seated Juror 139 as an alternate juror. After the jury found Trimble guilty, one of the regular jurors became ill. The trial court excused the ill juror and replaced her with Juror 139. During voir dire, Trimble had challenged Juror 139 for cause based both on pretrial publicity and the juror's views on the death penalty.[229/] The court overruled the objections, and Juror 139 remained in the pool of perspective jurors, eventually to be seated as first alternate.[230/]

The state says that Trimble had one other opportunity to excuse Juror 139. After individualized voir dire, the trial court gave the state and Trimble six peremptory challenges to members of the regular jury panel.[231/] Trimble's trial counsel used five of his six peremptory challenges, passing on his final challenge.[232/] At the time Trimble's attorney waived his sixth peremptory challenge, Juror 139 had not been seated. After empaneling twelve jurors, the court explained, "I have agreed to empanel four alternate jurors; you each get two peremptories as to that."[233/] Both Trimble and the state used both alternate juror peremptory challenges.[234/] Through this process, Juror No. 139 became the first alternate juror.[235/]

_____

[229/][App'x 5 at 2764-65.]

[230/][App'x 5 at 2765-66.]

[231/][App'x 5 at 3912-13.]

[232/][App'x 5 at 3917.]

[233/][App'x 5 at 3917.]

[234/]-[App'x 5 at 3917-19.]

[235/][App'x 5 at 3919-20.] With his final peremptory challenge to alternate jurors, Trimble excused Juror 133 from service as first alternate. Trimble had also challenged Juror 133 for cause. [App'x at 2816-17.] During voir dire, Juror 133 repeated that the "best way" to express his views on the death penalty was "an eye for an eye." [App'x 5 at 2596, 2605.] He also said that he believed that death should be automatic for aggravated murder. [App'x at 2610-11.] Faced with the choice of seating Juror 133 and waiving juror bias as a basis for appeal or seating Juror 139 and preserving this objection for appeal, Trimble's counsel reasonably opted for Juror 139. As the state would have it,

Case No. 5:10-CV-00149
Gwin, J.

The jury convicted Trimble, and the trial moved to the penalty phase.  During the penalty phase, and outside the presence of the jury, the Court said to both counsel "Juror Number 11 is sick and having a hard time.  She's requested she can't take it any more, she wants to go home, she's ill."[236]  The illness apparently involved "coughing and sneezing and eyes watering."[237]  In response to the trial court's questioning, she said she was "just like nauseous."[238]  The prosecutor then said "we have no objection to excusing her and seating the first alternate."[239]  The court said "[w]e'll call you and let you go home in a minute."[240]  The court then excused the juror from the courtroom.[241]  Over defense objection, the Court excused Juror 11 and instructed and seated the first alternate juror, Juror 139.[242]  The jury, so empaneled, unanimously voted that death sentences should be imposed.[243]

On appeal to the Ohio Supreme Court, Trimble argued that the failure to excuse Juror 139 for cause deprived him of the right to a fair trial and due process of law.[244]  Considering this argument, the Ohio Supreme Court first said that "Trimble has waived any objection to these

---

Trimble waived objection as to either juror before he even knew that they might be seated as alternate.  Such a jury selection scheme would raise grave constitutional problems, which the Court declines to analyze today.

[236][App'x 5 at 7623-24.]

[237][App'x 5 at 7624.]

[238][App'x 5 at 7625.]

[239][App'x 5 at 7625.]

[240][App'x 5 at 7626.]

[241][App'x 5 at 7626.]

[242][App'x 5 at 7630.]

[243][App'x 5 at 8045.]

[244][Doc. 19 at 16.]

-42-

Case No. 5:10-CV-00149
Gwin, J.

overruled challenges because of his failure to exhaust his peremptory challenges."[245]  The Ohio

Supreme Court then said that "the juror's responses [to voir dire] showed that he would not

automatically vote for the death penalty" and that "the trial court committed no plain error in

overruling the challenge for bias against juror No. 139."[246]

**C. Procedural Default**

*1. Legal Standard*

Generally, the doctrine of independent and adequate state grounds "applies to bar federal

habeas when a state court declined to address a prisoner's federal claims because the prisoner had

failed to meet a state procedural requirement.  In these cases, the state judgment rests on independent

and adequate state procedural grounds."[247]  The four-part *Maupin* test determines whether a claim

has been procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable
> to the petitioner's claim and that petitioner failed to comply with the rule. . . .
> Second, the court must decide whether the state courts actually enforced the state
> procedural sanction. . . .  Third, the court must decide whether the state procedural
> ground is an adequate and independent state ground on which the state can rely to
> foreclose review of a federal constitutional claim. . . .  Once the court determines that
> a state procedural rule was not complied with and that the rule was an adequate and
> independent state ground, then the petitioner must demonstrate . . . that there was
> cause for him not to follow the procedural rule and that he was actually prejudiced
> by the alleged constitutional error.[248]

Under the second prong, "there must be unambiguous state-court reliance on a procedural default

---

[245]/*Trimble*, 911 N.E.2d at 259.

[246]/*Id.* at 259-60.

[247]/*Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

[248]/*Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)) (alterations in *Stone*).

Case No. 5:10-CV-00149
Gwin, J.

for it to block [habeas] review."[249]

"[T]he question of whether a claim should be addressed on collateral review under the judicially created doctrine of procedural default is independent of the question of whether Congress requires deference pursuant to AEDPA."[250]  Thus, on habeas corpus review, a federal court first determines whether the state court found the petitioner's claim to be procedurally defaulted.  If it did not, then the federal court evaluates whether AEDPA deference applies.[251]

    *2. Analysis*

    The Court finds three reasons to reach the merits of this claim.  First, the Court finds that the Ohio Supreme Court did not actually enforce its procedural default rule, and, as such, under *Maupin*, the claim is available on habeas.  Second, the Court finds that the Ohio Supreme Court could not reasonably find that Trimble did not comply with the procedural rule.  Finally, the Court finds that assuming arguendo that the claim was procedurally defaulted, Trimble has established both cause and prejudice to excuse any default stemming from his attorney's ineffectiveness.

    The Ohio Supreme Court's opinion is ambiguous, but suggests that it did not actually find procedural default on the juror bias claim.  The Ohio Supreme Court first announced that "Trimble has waived any objection to these overruled challenges because of his failure to exhaust his peremptory challenges."[252]  However, it then went on to address the merits of Trimble's juror bias claim.  It explained that "[a] capital defendant may challenge for cause any prospective juror who,

---

[249] *Bowling v. Parker*, 344 F.3d 487, 499 (6th Cir. 2003).

[250] *Fleming v. Metrish*, 556 F.3d 520, 530 (6th Cir. 2009).

[251] A state court may find a claim to be procedurally defaulted and yet evaluate it on the merits such that AEDPA deference applies.  *See id.* at 532.

[252] *Trimble*, 911 N.E.2d at 259.

-44-

Case No. 5:10-CV-00149
Gwin, J.

regardless of the evidence of aggravating and mitigating circumstances, and in disregard of the jury

instructions, will automatically vote for the death penalty."[253]  The court then reasoned that

> juror No. 139 had assured the court that he could listen to the evidence, follow the
> courts instructions, and vote for a life sentence if the state failed to prove beyond a
> reasonable doubt that the aggravating circumstances outweighed the mitigating
> factors.  Thus, this juror's responses showed that he would not automatically vote for
> the death penalty.[254]

The Ohio Supreme Court offered similar analysis of Juror 139's potential bias from pretrial publicity:

> Ultimately, juror No. 139 stated that he could set aside what he had previously
> learned about the murders, listen to the evidence presented in court, and follow the
> court' instructions.  Based on these assurances, the trial court committed no plain
> error in overruling the challenge for bias against juror No. 139.[255]

These analyses suggests that the Ohio Supreme Court did not actually apply Ohio's

procedural default rule to Trimble's claim.  Had it done so, it would either have labeled as advisory

the evaluation the merits of Trimble's juror bias claim (as the State of Ohio did in its briefing) or

declined to consider it entirely.[256]

Moreover, Ohio has not consistently followed the rule that the Warden says it applied in this

case—requiring a defendant to exhaust his peremptory challenges for both the jury and alternate

jurors before permitting an appeal based on the seating of an alternate juror who later deliberates.

---

[253] *Id.*

[254] *Id.*

[255] *Id.* at 260.

[256] "Where the basis for the state court's decision is unclear, . . . the federal habeas court must look to the arguments presented to the state court." *Meeks v. Bergen*, 749 F.2d 322, 325 (6th Cir. 1984) (quoting *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983)).  And "[w]here . . . the state has argued in the alternative, . . . the federal courts may assume that the state court did not rely solely upon either the merits or the procedural grounds." *Id.* at 326.  In this case, however, the record reveals ambiguity upon ambiguity:  The state framed its arguments on juror bias as "[a]ssuming *arguendo* that this Court reaches the merits."  [App'x 1 at 2222.]  The Ohio Supreme Court, however, offered no similar caution.  Taking this omission into account, the Court finds that the Ohio Supreme Court did not address Trimble's bias claim for the sake of argument and instead simply made its assessment of Trimble's claim.

-45-

Case No. 5:10-CV-00149
Gwin, J.

Such an inconsistent application of procedural rules also suggests that the Ohio Supreme Court did not apply this rule in this case.[257]  This Court is aware of two other cases implicating this purported rule:  In one case, a defendant apparently reserved his final peremptory to avoid the seating of two alternates on the jury.[258]  She then used her two peremptories on the alternates.[259]  On appeal, she challenged the trial court's decision not to exclude those two alternate jurors for cause.[260]  Rather than suggest that this challenge was procedurally defaulted, the Ohio Supreme Court gave a merit review of the defendant's challenge for cause.[261]  In another case, however, an Ohio appeals court clumsily reasoned that a challenge to a potentially biased juror had been waived because counsel excused a different alternate juror.[262]  The Ohio Supreme Court's treatment of this claim suggests it did not apply the procedural default rule in this case.

In sum, because the Ohio Supreme Court's decision does not reflect "unambiguous state-court reliance on procedural default," and because Ohio courts have not consistently followed this rule, the Court finds that procedural default does not now block this Court's review under *Maupin*'s first prong.[263]

Yet even if the Ohio Supreme Court *did* find Trimble's claim to be procedurally defaulted, and even if its remaining analysis of Juror 139 was dicta, this Court finds that such a determination

---

[257]/*See* *Franklin v. Anderson*, 434 F.3d 412, 420-21 (6th Cir. 2006).

[258]/*See* *State v. Roberts*, 850 N.E.2d 1168, 1182 (Ohio 2006).

[259]/*See* *id*.

[260]/*See* *id*.

[261]/*See* *id*.

[262]/ *See* *State v. Wright*, No. 00CA39, 2001 WL 1627643, at *19 (Ohio Ct. App. 2001).

[263]/*See* *Bowling*, 344 F.3d at 498.

Case No. 5:10-CV-00149
Gwin, J.

of fact would be "unreasonable . . . in light of the evidence presented in the state court proceeding."[264/]  After empaneling twelve jurors in the petit jury, the court explained, "I have agreed to empanel four alternate jurors; you each get two peremptories as to that."[265/]  During this process, Trimble struck jurors 112 and 133.  As such it would be unreasonable to determine that Trimble did not exhaust his peremptory challenges as to the alternate jurors or that he waived his challenge to the trial court's refusal to excuse Juror 139 for cause.[266/]

A third ground also permits review of Trimble's claim on the merits:  A petitioner can overcome procedural default by showing both cause for, and prejudice resulting from the default.[267/]  An attorney's failure to preserve a juror bias claim through procedural default is ineffective assistance of counsel and is cause for procedural default.[268/]  The seating of a biased juror is per se prejudicial.[269/]  As such, even if Trimble had procedurally defaulted his objection to seating Juror 139—which this Court has found he did not do—Trimble can show cause and prejudice sufficient to excuse his procedural default.[270/]  For each of these three reasons, the Court reaches the merits of this claim.

---

[264/] 28 U.S.C. § 2254(d)(2).

[265/] [App'x 5 at 3917.]

[266/] Had Trimble been required to exhaust his peremptory challenges as to both the empaneled jury and the alternates to preserve a right to challenge on a juror seated as an alternate, Trimble would have been required to seat a juror that he excused as an alternate.

[267/] See Wainwright v. Sykes, 433 U.S. 72, 84 (1977).

[268/] See McClesky v. Zant, 499 U.S. 467, 494 (1991) ("[C]onstitutionally '[i]neffective assistance of counsel . . . is cause.'") (further citation omitted); Franklin, 434 F.3d at 428 ("Accordingly, the State can make no argument that Franklin's trial counsel acted strategically in keeping Juror Arthur on the panel because she was, like Franklin, African-American.  To permit this would be to allow trial counsel to waive the defendant's right to an impartial jury.").

[269/] See id.

[270/] See id.

-47-

Case No. 5:10-CV-00149
Gwin, J.

**C. Death Penalty**

*1. Background*

Over more than thirty pages of trial transcript, Juror 139's voir dire shows significant inconsistency.  At times, the juror assured the court that he could follow the law.  Other times, however, the juror showed a strong inability or unwillingness to apply Ohio's capital sentencing scheme.  For context, the Court quotes this voir dire at length.

| | |
|---|---|
| THE COURT: | Okay. The next thing we have to talk to you about your opinion on the death penalty, there is a potential for that in this case.  Are you against imposing the death penalty for religious or moral reasons? |
| JUROR: | No. |
| THE COURT: | Would your views on the death penalty permit or substantially impair your ability as a juror to perform your duty in accordance with the oath you've taken a juror and the Court's instructions which I would give you? |
| JUROR: | No. |
| THE COURT: | Okay.  Do you understand if the case does get to the second phase the Court is going to ask you that you're to consider the evidence on the aggravating circumstances and also the evidence on any of the mitigating factors and you're to weigh all those and determine whether the aggravating circumstances outweigh the mitigating circumstances and if they do the Court would instruct you the appropriate penalty is death.  Could you follow that instruction? |
| JUROR: | Yes. |
| THE COURT: | And the Court would also instruct you if the mitigating circumstances are equal or if they fail to establish beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances that the appropriate penalty is life, could you follow that instruction? |

Case No. 5:10-CV-00149
Gwin, J.

JUROR:              Yeah.

THE COURT:          You may inquire

                         * * *

[Prosecutor]:
Q          Okay.  And wouldn't be until such time that you made that finding
           [of guilt that] we would even start talking about what sentence would
           be appropriate, do you understand that?

A          Yeah.

Q          Okay.

A          Except the two.

Q          In other words, what I'm asking do you believe that just because you
           found him guilty in the trial stage that he's automatically now subject
           to the death penalty?

A          If I find him guilty?

Q          *At the trial stage do you now believe he's automatically subjected to
           the death penalty*?

A          *Yeah*.

Q          You do?

A          *If he killed three people he should*.

Q          Do you understand in Ohio the law is that you don't make that
           decision at that time, do you understand that?

A          How is it? Yeah, I understand.

Q          *You understand that now*?

A          *Yeah*.

Q          Okay.  You don't have a right to make that decision until after you
           have heard the evidence in the second stage of the trial.

-49-

Case No. 5:10-CV-00149
Gwin, J.

A          Yeah, I—on the, on the second stage.

Q          You understand that now?

A          Yeah.

Q          Okay.  Could you then, giving the defendant his due, wait to make a decision about what penalty he should receive, whether death or life in prison sentence, until such time as you listen to all the evidence presented by the State or the defendant in the sentencing stage?

A          Run that by me again.

Q          Okay.  My question is could you wait before making a decision as to what penalty the defendant would be subjected to, whether it is death or one of the life in prison sentences, could you wait until you hear all the evidence at the second stage?

A          You mean the reason why?

Q          That is correct.

A          *Yeah.  Yeah.  Or decide whether it is one or the other*?

Q          Correct.

A          Am I understanding that right?

Q          You're understanding right one or the other and something that happens after the trial, okay?  As to at least after the guilt or innocence phase or stage, you understand that?

A          Yeah.

Q          Let me ask you what your opinion is of the death penalty.

A          My opinion of it?

Q          Uh-huh.

A          *I think the penalty should be there.*

Q          Okay.

-50-

Case No. 5:10-CV-00149
Gwin, J.

| | |
|---|---|
| A | *Because if you take a life why should you be allowed to live*? |
| Q | Okay.  You understand that in Ohio, again the law is that even if you take a life you may be allowed to live, you understand that? |
| A | *Depending on why you did it?* |
| Q | Well, depending on your weighing and balancing of what the judge has described to you, the aggravating circumstances, which are nothing more than these specifications we talked about at trial, now transfer over and now call them aggravating circumstances in the sentencing part of the trial; so if the State proved beyond a reasonable doubt that two or more people were killed in a course of conduct, that is an example of aggravating circumstance, you understand that? |
| A | Uh-huh. |
| Q | And at the sentencing stage the defense, on behalf of Mr. Trimble, are permitted to present to you evidence of mitigating factors and that is pretty much anything they want to talk about with reference to Mr. Trimble, his history, pretty much anything that they feel may cause you as a Juror to not vote for the death sentence, do you understand that? |
| A | (Nods affirmatively.) |
| Q | All right. |
| A | Yeah, I understand it. |
| Q | All right. |
| Q | So their job is to convince you to not vote for the death sentence and they have a right to present that evidence; are you willing listen? |

                                            * * *

| | |
|---|---|
| Q | Are you willing to listen to whatever evidence they decide to present to you? |
| A | Yeah. |
| Q | Before you make up your mind about |
| A | Yeah. |

-51-

Case No. 5:10-CV-00149
Gwin, J.

Q       Okay.   And if the judge instructs you that if you find that these
        aggravating circumstances presented by the State do not outweigh in
        your mind  the mitigating factors presented by the defendant, beyond
        a reasonable doubt, and if the Court instructs you that if you find that
        you must bring in a sentence of the one of the life sentence penalties,
        would you be able to follow the judge's instructions and do that?

A       *Yeah.*

Q       Okay.   And if the judge instructs you that if you find that these
        aggravating factors that the State presents do outweigh the mitigating
        factors that the defense presents, beyond a reasonable doubt, and if
        the judge instructs you that you then must bring in a sentence of
        death, would you be able to do that?

A       Yes.

Q       And if you do that as a juror you would be required to sign a jury
        verdict form indicating that you voted for death, would you be able
        to sign that form?

A       Yeah.

Q       Okay.  And you also may be called upon in open court to state that
        death is—is the verdict that you have decided upon and that is your
        signature on that form, could you do that?

A       If I signed it, yeah.

Q       Okay.  And, conversely, if you were to bring in a sentence less than
        death, one of the life sentences, would you be able to sign a verdict
        form indicating that?

A       Yeah.

Q       And could you also in open court state on the record that is your
        decision and your signature?

A       Yeah.

. . .

[By defense counsel]

Q       First of all, without having seated a jury, presented any evidence, or

-52-

Case No. 5:10-CV-00149
Gwin, J.

presented any testimony from any witnesses, you've got everybody asking you your views on the death penalty.

A      No—yeah, I never really thought about it.

Q      Is this the first time you ever had to articulate your views as far as how you feel and what you believe?

A      This is the first time ever called to do this.

Q      You've never had a discussion with anyone regarding what you think about the death penalty before?

A      Yeah, I just, if you're guilty, without a reasonable doubt, then if you take somebody's life your life should go—you shouldn't be allowed to live either.

Q      *And then basically that is the way you feel?*

A      *Yeah.*

Q      And that is one of the things that I—I made a note of that you felt that, if you take a person's life you shouldn't be able to live.

A      *An eye for an eye, all that.*

Q      That is your feeling?

A      *Yeah.*

Q      That is how you look at your position as a juror in this particular case?

A      *Yeah.  What goes around comes around.*

Q      So if you were seated as a juror in this particular case you would come into this whole process with that mind set, that is what you believe regarding the death penalty?

A      *If he's guilty.*

Q      If he's guilty.  Okay, let's kind of back up a little bit then and start to talk about this two-step process that we have because you understand

Case No. 5:10-CV-00149
Gwin, J.

and you have indicated that you have been able to follow this that it is a two-step process?

A       Yeah.

Q       Okay.  The first stage is where you as a juror with the other individuals that are selected would make that determination as to whether Mr. Trimble is guilty of aggravated murder with a specification beyond a reasonable doubt.  You understand that concept?

A       *You have to be very careful when somebody's life is on the line.*

Q       Okay, but you understand—let's please just try to answer my question.  You do understand that concept?

A       Yeah.

Q       And you understand that as the prosecutor pointed out to you that that would be a situation where you would make a determination as to whether Mr. Trimble purposefully took the lives—or took the life of a person?

A       Right.

Q       And in addition to making that determination you also have to decide whether beyond a reasonable doubt the State has established the specifications that are attached to that aggravated murder charge, you understand that?

A       Yeah.

Q       Okay.  And it's been indicated to you that one of those specifications is that these murders were done with prior calculation and design, you understand that?

A       Yeah.

Q       And this was a killing of two or more persons, you understand that?

A       Uh-huh.

Q       Okay.  Now the only way that you get to the second stage, to

-54-

Case No. 5:10-CV-00149
Gwin, J.

determine what the appropriate penalty is, is to make this finding, these two findings that we just talked about in the first stage. You're understanding that?

A        Yeah.

Q        Okay.  Then once you get to the second stage, then it is your job as a juror to determine the appropriate penalty, okay?  And the judge is going to instruct you that your duty is to weigh those aggravating circumstances that were established in the first part of the case which were the specifications, do you follow that?

A        Uh huh.

Q        Okay. In other words, prior calculation and design, purposeful killing of two or more persons, committed in the course and conduct of an aggravated burglary or kidnapping, you understand those specifications?

A        *If he knew—what you guys are saying, if he already knew what he was doing, or whatever, then he should get the death penalty.  But if he's like for some reason off and whatever, then maybe just prison or something like that, is that what you mean*?

Q        No.  What I'm trying to explain to you, to make sure that you understand how the process works, in order to get to the penalty, you have to make the finding of guilt for aggravated murder and the specifications that are attached to that beyond a reasonable doubt, you understand that?

A        Has to be guilty before you can go to step two.

Q        Very good.  Very good.  And then your job as a juror is to take and weigh those specifications as against mitigating evidence that we would present to you, you understand that?

A        Yeah.

Q        Okay.  Your beliefs that you have indicated are that if you take a life you shouldn't be allowed to live, is that—that is a fair statement of your beliefs, correct?

A        Ahhh . . .

Case No. 5:10-CV-00149
Gwin, J.

Q               That is what you said.

A               *If it was planned and knew what they were doing, yeah.*

Q               That is what you said on a few occasions, correct?

A               *Right.*

Q               Okay.  How are you going to be able then to move into that second stage and consider both sides' evidence presentations when you have already made that determination of guilt beyond a reasonable doubt on the aggravated murder and the specifications?

A               I have to listen to that. He's got to be guilty first.

Q               And I understand that, and you have already made that determination. That is the only way you get to the weighing process.

A               Right.

Q               My question to you is based upon your beliefs, how are you going to be able to do that in this case?

A               (No answer.)

Q               Are you going to be able to do that in this case?

A               Are you asking—

THE COURT:     I don't think he understands your question, make it a little clearer.

[Defense Counsel]:     Okay.

THE COURT:     Or do you want me to ask it?

[Defense Counsel]:     No, I'll do it, Judge.

Q               Once you make the finding of guilt then your duty is to determine what the penalty is, you understand that?

A               Yeah, you have to figure out.

Case No. 5:10-CV-00149
Gwin, J.

Q        And what is the appropriate sentence?

A        Right.

Q        Part of that duty is you're to consider the aggravating circumstances
         which the State gives to you which are the specifications from the
         first part of the trial, do you understand that?

A        (No answer.)

Q        Do you understand that?

A        *Yeah, I think.*

Q        And do you recall what those specifications are, that the killing was
         done with prior calculation and design?

A        Right.

Q        That is not correct. I'm sorry, if two or more persons were—that it
         was a course of conduct involving the killing of two or more persons,
         you understand that?

A        Yeah.

Q        That is one of the specifications?

A        Yeah.

Q        And that it was done in the commission an aggravated burglary or a
         kidnapping, you understand that?

A        Yeah.

Q        After you have made that determination in the first stage, then you
         move to the second stage, you understand that?

A        Right.  We found him guilty, now we go the second, see which
         sentence he gets.

Q        Right.

A        *If he knew what he was doing at the time, had a clear head, knew*

-57-

Case No. 5:10-CV-00149
Gwin, J.

> *exactly, planned out, then he should get the death penalty. But if he
> was under the influence or something, or not quite right in the head,
> if you can prove that, then maybe it shouldn't be so harsh. Either
> way is bad but then you get the prison time.*

Q          So you understand that that is your duty to take into consideration--

A          His side.

Q          —all those factors?

A          Right.

[Defense counsel]:     Thank you, I have no further questions.

JUROR:          Am I done now?

THE COURT:      You're just about done. just want to make sure. They have
asked you a lot of long questions, hard to follow. Can you
follow my instructions at the sentencing phase?

JUROR:          You mean—

THE COURT:      Whatever the Court would tell you the law is, can you follow
the law if the Court would tell you what the law is, can you
follow that?

JUROR:          *Yeah.*

THE COURT:      Okay.

JUROR:          Whatever the law is, yeah.

THE COURT:      Pardon?

JUROR:          Whatever the law is, yeah.

THE COURT:      That is your job as a juror to follow whatever the law is. You
can do that?

JUROR:          (Nods affirmatively.)[271/]

---

[271/][App'x 5 at 2745-64.]

-58-

Case No. 5:10-CV-00149
Gwin, J.

The Ohio Supreme Court, in a single paragraph, found that "[J]uror 139's responses showed that he would not automatically vote for death" and thus "the trial court committed no plain error in overruling the challenge for bias against juror No. 139."[272]

*2. Legal Standard*

Since the Ohio Supreme Court evaluated the juror bias claim on the merits, AEDPA deference applies.[273] "[J]uror bias is a factual issue."[274] In dealing with a factual issue, AEDPA requires this Court to assess whether the trial court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[275] The Court presumes that the Ohio Supreme Court's determination is correct; the petitioner must rebut this presumption by "clear and convincing evidence."[276]

"[A] juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.*"[277] "[B]ecause the Constitution guarantees a defendant on trial for his life the right to an impartial jury, the trial court's failure to remove [a] juror for cause [is] constitutional error under" this standard.[278] "A juror who will automatically vote for

---

[272] *Trimble*, 911 N.E.2d at 259-60.

[273] 28 U.S.C. § 2254(d).

[274] *Franklin*, 434 F.3d at 426; *see also* *Wainright v. Witt*, 469 U.S. 412, 429 (1985).

[275] 28 U.S.C. § 2254(d)(2); *see* *Franklin*, 434 F.3d at 426.

[276] 28 U.S.C. § 2254(e)(1); *see* *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004).

[277] *Wainright*, 469 U.S. at 420 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis added in *Wainright*).

[278] *Morgan*, 504 U.S. at 728; (citing *Ross*, 487 U.S. at 85).

-59-

Case No. 5:10-CV-00149
Gwin, J.

the death penalty in every case will fail in good faith to consider the evidence of aggravating and

mitigating circumstances as the instructions require him to do."[279]/  Such error is never harmless: "If

even one such juror is empaneled and the death sentence is imposed, the State is disentitled to

execute the sentence."[280]/

*3.  Analysis*

While the law is clear, in practice, jurors are less so.  They often give inconsistent responses

---

[279]/*Id.* at 729.  Like the Illinois capital sentencing scheme that the Supreme Court considered in *Morgan*, Ohio's capital sentencing scheme requires jurors to weigh aggravating and mitigating factors:

> (B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
> > (1) Whether the victim of the offense induced or facilitated it;
> > (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
> > (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
> > (4) The youth of the offender;
> > (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
> > (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
> > (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.
> (C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death. The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing.

Ohio Rev. Code Ann. § 2929.04.

[280]/*Morgan*, 504 U.S. at 729.

-60-

Case No. 5:10-CV-00149
Gwin, J.

to voir dire.[281] Many of the questions that a court must ask are unfamiliar, and many jurors have not

formed definite opinions. Inconsistences are no less present in death-penalty cases. Many people

have never been called upon to articulate their views on the death penalty. Few have any

understanding of an independent penalty trial-within-a-trial. Fewer still have been asked to do so

overshadowed by the very real possibility of being asked to sentence a person to death. And fewer

yet have had to actually square their own moral compass with the commands of the law.

Both the trial court, the Ohio Supreme Court, and this Court, need consider all of the juror's

voir dire examination. Both the trial court and reviewing courts should not search for an isolated

juror statement that the juror could fairly apply Ohio's death penalty law. Or search for an isolated

statement that the juror could not fairly apply Ohio's jury instruction. Against a backdrop of

repeated expressions suggesting that the juror could not be fair when considering whether to impose

the death penalty, it is not enough that the juror answered isolated leading questions that he could

fairly apply the law.

Juror 139's voir dire statements reveal that he did not understand his responsibility for

weighing aggravating and mitigating factors before picking a sentence. And Juror 139's statements

show he could not fairly apply that law.

Juror 139 "never really thought about" the death penalty, and voir dire was "the first time [he

had] ever been called to" articulate his views on the death penalty.[282] To be sure, a juror's inability

to articulate his or her feelings on the death penalty does not automatically disqualify the juror from

service on a death-penalty jury. Indeed, the Constitution requires that a juror must be willing to put

---

[281]/*See* *Patton v. Yount*, 467 U.S. 1025, 1039-40 (1984).

[282]/[App'x 5 at 2755.]

Case No. 5:10-CV-00149
Gwin, J.

aside her or his own views on the death penalty and instead apply the law.[283/]

But herein lies the problem with the jury that condemned Trimble.  Juror 139's statements do not show that he would fairly apply the law.  On all but one opportunity to articulate his views, Juror 139 said that if Trimble was guilty, Trimble should be put to death.[284/]  In light of these repeated articulations, the Ohio Supreme Court's summary determination that Juror 139 would instead apply the law was simply unreasonable.

When the Prosecutor finally asked Juror 139 his understanding of the capital sentencing scheme, the juror showed an inability to dissociate his view from the requirements of the law:

| [Prosecutor:] | At the trial stage do you now believe he's automatically subjected to the death penalty? |
|---|---|
| [Juror No. 139:] | Yeah. |
| [Prosecutor:] | You do? |
| [Juror No. 139:] | If he killed three people he should. |
| [Prosecutor] | Do you understand in Ohio the law is that you don't make that decision at that time, do you understand that? |
| [Juror No. 139:] | How is it?  Yeah, I understand.[285/] |

This statement at this point in the voir dire is especially troubling for two reasons.  First, the juror's first description of his views gives the best evidence of what his views actually were.  But, second, and more troublingly, the juror gave this explanation after repeated attempts by both the court and the prosecutor to explain what the law required, and then Juror 139 quickly retreated from it.  Far

---

[283/]*See* *Wainright*, 469 U.S. at 424 ("That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'").

[284/][App'x 5 at 2745-2766.]

[285/][App'x 5 at 2749.]

Case No. 5:10-CV-00149
Gwin, J.

from showing a willingness to put aside his own views and follow the law, this exchange shows how unshakable Juror 139's views were.  After twelve questions, each acknowledging that the juror understood the requirements of the law, the juror articulated that "[i]f [Trimble] killed three people he should" be automatically subject to the death penalty.[286/]  He had "stake[d] a firm 'pro-death-penalty stance.'"[287/]

 In spite of repeated corrections by counsel and the court, the juror never showed that he understood that Ohio's capital sentencing scheme differed from his own views on the death penalty, nor, for that matter, that he could weigh aggravating and mitigating evidence.  Even after the foregoing colloquy with the prosecutor and after further attempts to explain the required process, the juror evinced the same confusion:

| [Defense counsel:] | And that is one of the things that I—I made a note of that you felt that, if you take a person's life you shouldn't be able to live. |
|---|---|
| [Juror 139:] | An eye for an eye, all that. |
| [Defense counsel:] | That is your feeling? |
| [Juror 139:] | Yeah. |
| [Defense counsel:] | That is how you look at your position as a juror in this particular case? |
| [Juror 139:] | Yeah. What goes around comes around. |
| [Defense counsel:] | So if you were seated as a juror in this particular case you would come into this whole process with that mind set, that |

---

[286/]In this sense, Juror 139 differed greatly from Juror Eddleman in *Williams*.  In that case, Juror Edleman, in her final exchange with defense counsel—however equivocally—said that she could set aside her personal views on the death penalty and parole eligibility and instead listen to the evidence.  *Id.* at 956-57.

[287/]*Williams v. Bagley*, 380 F.3d 932, 958 (6th Cir. 2004).

Case No. 5:10-CV-00149
Gwin, J.

                                is what you believe regarding the death penalty?

        [Juror 139:]           If he's guilty.[288]

Nor was this latest articulation the last time Juror 139 would misconstrue his responsibilities.  Later,

he said:

    Q               Okay. In other words, prior calculation and design, purposeful killing of two or more persons, committed in the course and conduct of an aggravated burglary or kidnapping, you understand those specifications?

    A               If he knew—what you guys are saying, if he already knew what he was doing, or whatever, then he should get the death penalty.  But if he's like for some reason off and whatever, then maybe just prison or something like that, is that what you mean?

    Q               No. . . . [289]

The juror's final attempt to articulate his understanding of the law came only marginally closer to

Ohio's sentencing scheme:

    Q               After you have made that determination in the first stage, then you move to the second stage, you understand that?

    A               Right.  We found him guilty, now we go the second, see which sentence he gets.

    Q               Right.

    A               If he knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty.  But if he was under the influence or something, or not quite right in the head, if you can prove that, then maybe it shouldn't be so harsh.  Either way is bad but then you get the prison time.

    Q               So you understand that that is your duty to take into consideration—

---

[288]/[App'x 5 at 2755-56.]

[289]/[App'x 5 at 2759.]

Case No. 5:10-CV-00149
Gwin, J.

A     His side.

Q     —all those factors?

A     Right.[290/]

The voir dire may have convinced the juror that the death penalty is not appropriate in every murder case.  But it did not show that he could dissociate his own view—that death should be automatic for Trimble unless Trimble could "prove" that he was "under the influence or not quite right in the head"—from the law's obligation to *weigh* statutorily enumerated mitigating factors. That is, he believed in shifting the burden of proof to Trimble at the penalty stage, with a presumption of death.  Such bias is simply unacceptable.

The trial court's attempts to instruct Juror 139 on the law do little to mitigate this concern. Juror 139 answered the court's leading questions to the effect that he could follow the law as told to him by the court.  Yet a habeas court need not accept a juror's assurances.[291/]  Two considerations also lead this Court to place less reliance on the juror's responses to leading questions.  On multiple occasions, Juror 139 interrupted counsel to offer affirmative answers showing he could fairly apply the death penalty before counsel had even finished articulating the question.[292/]  Second, when a juror

---

[290/][App'x 5 at 2762-63.]

[291/]*See Franklin*, 434 F.3d at 427 ("Although we normally defer to the assessment of the trial judge, who hears the prospective juror's tone of voice and sees her demeanor, in this case, the cold record alone is so extensive and so persuasive that it outweighs our presumptive deference.").

[292/]Obviously, there are some difficulties in making this determination from a transcript, but the Court notes two instances:

Q     Are you willing to listen to whatever evidence they decide to present to you?

A     Yeah.

Q     Before you make up your mind about

Case No. 5:10-CV-00149
Gwin, J.

continues to incorrectly describe the law after the court has explained it, there is even greater reason

to believe that the juror will *not* apply the law correctly.[293/]

　　　When all his responses are considered, Juror 139 was unwilling or unable to set aside his own

view that Trimble should receive the death penalty if Trimble was found guilty.  Even charitably

considering an alternative explanation, Juror 139 showed an inability to grasp the ways in which

Ohio's capital sentencing scheme differed from this opinion.  Either situation raises a constitutional

problem.

　　　The Sixth Circuit has upheld convictions where prospective jurors have given equivocating

responses.  But in contrast to Juror 139's categorical statements, the jurors in *Williams v. Bagley*

showed significantly greater willingness to put aside personal views and consider the law as given.

───────────────────

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
| A     | Yeah.                                                                                    |

[App'x 5 at 2752]  Later, the following exchange took place:

|     |                                                                                                                                                                                                                                                                                                    |
|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Q   | After you have made that determination in the first stage, then you move to the second stage, you understand that?                                                                                                                                                                                  |
| A   | Right.  We found him guilty, now we go the second, see which sentence he gets.                                                                                                                                                                                                                      |
| Q   | Right.                                                                                                                                                                                                                                                                                              |
| A   | If he knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty.  But if he was under the influence or something, or not quite right in the head, if you can prove that, then maybe it shouldn't be so harsh. Either way is bad but then you get the prison time. |
| Q   | So you understand that that is your duty to take into consideration—                                                                                                                                                                                                                                |
| A   | His side.                                                                                                                                                                                                                                                                                           |
| Q   | —all those factors?                                                                                                                                                                                                                                                                                 |
| A   | Right.                                                                                                                                                                                                                                                                                              |

[App'x 5 at 2762-63.]

[293/]*See* id. at 427-28.

-66-

Case No. 5:10-CV-00149
Gwin, J.

In that case, Juror Eddleman stated at the end of her voir dire that she would consider the three

possible penalties "equally."[294/]  Considering the penalties "equally" differs greatly from beginning

with a presumption that the death penalty is appropriate and requiring the defendant to "prove" that

he was "not quite right in the head."  Similarly, Juror Camp in *Williams* said that if she "had doubts

then [she] wouldn't vote for the death penalty" based on the statutorily required weighing.[295/]  It is

logically incoherent to assert that juror Camp and Juror 139 are equivalent:  Camp stated that if she

has doubts after weighing aggravating and mitigating circumstances, she would not vote to impose

the death penalty; Juror 139 stated that he will apply the death penalty unless the defendant can prove

that he is not right in the head.  Simply put, these jurors are not equivalent.

Perhaps more importantly, during voir dire, both of the *Williams* jurors showed that they

understood that capital sentencing law differs from their own moral views—and showed real, human

difficulty in determining whether they could vote for a verdict at odds with their personal views.[296/]

That Juror 139 showed no similar consideration or deliberation heightens the inference that he never

managed to differentiate his own views from the statutorily mandated weighing process.

When all of his responses are considered, Juror 139 failed to understand Ohio's weighing

scheme and failed to show that he could put aside his own beliefs and carry out Ohio law.  These

---

[294/]380 F.3d at 957.

[295/]*Id.* at 960.

[296/]Juror Eddleman stated, "I couldn't say that. I guess I don't like any three of the choices, is what I'm saying." *Id.* at 955.  In response to questions about whether she could weigh the evidence and "set these feelings aside" Juror Eddleman said that "depending on the evidence and everything [she] probably could" and that she would consider the possible penalties "equally." *Id.* at 956-57.  Similarly, Juror Camp, said that she would have "to think about" the different sentences. *Id.* at 959.  Nonetheless, she articulated that first "[i]t would have to be proved to me that it was—that the person is guilty" and in the second phase, if she had doubts about the weight of the mitigating and aggravating evidence, she would vote against the death penalty. *Id.* at 959.

Case No. 5:10-CV-00149
Gwin, J.

repeated failings make it unreasonable to determine that the juror understood the distinction.[297]  And

the pervasiveness of these misstatements leads this Court to conclude that Juror 139 could not apply

the law impartially.  As such, habeas corpus relief is appropriate on this claim.[298]

**D.  Bias from Pretrial Publicity**

In passing, Trimble also suggests that Juror 139 was biased from pretrial publicity, yet he

affords this claim no real analysis .[299]  Generally,

> [i]t is not required, however, that the jurors be totally ignorant of the facts and issues
> involved. In these days of swift, widespread and diverse methods of communication,
> an important case can be expected to arouse the interest of the public in the vicinity,
> and scarcely any of those best qualified to serve as jurors will not have formed some
> impression or opinion as to the merits of the case.  This is particularly true in
> criminal cases.  To hold that the mere existence of any preconceived notion as to the
> guilt or innocence of an accused, without more, is sufficient to rebut the presumption
> of a prospective juror's impartiality would be to establish an impossible standard.[300]

While Juror 139 acknowledged that he had heard about the case before trial, such awareness

does not itself disqualify.  This concern is further mitigated by the terms of the juror's service:  Juror

139 only served in the penalty phase of the trial, not its guilt phase.  Absent some more definite

suggestion from Trimble of what evidence suggests that Ohio's courts were unreasonable in finding

Juror 139 free of bias from pretrial publicity, the Court has no basis on which to disturb the Ohio

Supreme Court's finding.

**IX. Remedy**

---

[297]/*See Franklin*, 434 F.3d at 427 ("Even after she was corrected three times by the judge, she still insisted with her last statement that the defendant had to be proven innocent. . . .  While we appreciate the judge's attempts to rehabilitate this juror, he had a duty to dismiss a prospective juror who could not follow the law.").

[298]/*See id.* at 428.

[299]/[Doc. 19 at 32; Doc. 49 at 19.]

[300]/*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961).

Case No. 5:10-CV-00149
Gwin, J.

Because the Court finds unconstitutional defects in Trimble's capital sentencing hearing, the State may not execute the sentence.[301]  Before imposing the death penalty, Ohio must conduct a new sentencing hearing with an unbiased jury.[302]

## X.  Conclusion

Trimble senselessly killed three people.  This Court's decision is not a commentary on what Trimble did, or whether he should or will eventually be subject to capital punishment.  But even Trimble needs receive a Constitutionally unbiased jury at capital sentencing.  For this and the foregoing reasons, the Court **CONDITIONALLY GRANTS** Trimble's petition for a writ of habeas corpus on his juror bias claim.  Trimble's death sentences from his state conviction are vacated and set aside.  Trimble must be given a new capital sentencing hearing within 200 days of this Order or the Warden is not entitled to execute Trimble's death sentences.  The Court **DENIES** Trimble's petition as to all other claims.

Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this decision could be taken in good faith, and the Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) on grounds one (juror bias), two (admission of weapons), and three (prosecutorial misconduct).

IT IS SO ORDERED.

Dated: March 20, 2013                     s/      *James S. Gwin*
                                          JAMES S. GWIN
                                          UNITED STATES DISTRICT JUDGE

---

[301]/*See Morgan*, 504 U.S. at 729.

[302]/*See Bates*, 402 F.3d at 649.

-69-